Brown *agt.* The Mohawk and Hudson Rail Road Company.

------

## BROWN, plaintiff in error *agt.* THE MOHAWK AND HUDSON RAIL ROAD COMPANY, defendants in error.

### *Questions Discussed* (In the Court of Errors).

1. By what general *rule* must a circuit judge be governed in withholding plaintiff's evidence on questions of fact, from the jury and *directing a non suit.*

2. Whether plaintiff's evidence was sufficient to show that the defendants rail road *embankment* and *bridge* were so negligently and unskillfully constructed and done; as to have occasioned the injury complained of by the plaintiff? (*In sweeping away by a flood the rail road bridge and plaintiff's tannery and buildings below.*) And should the evidence have been submitted to the jury?

3. Whether the evidence of the plaintiff did or did not show that the *freshet* or *flood,* which occasioned the damage complained of, was so *unexpected* and *extraordinary* in its character and extent that it could not have been reasonably anticipated or guarded against, but an act of PROVIDENCE by which the plaintiff, as well as others, suffered?

### *Questions Discussed* (In the Court of Appeals).

1. Whether the decision of the Court of Errors in this case established the proposition that the testimony of the plaintiff below, was sufficient in point of law, to authorize the jury to find a verdict against the defendants below, and that the Supreme Court would not have been justified in setting aside the verdict found upon such testimony?

2. Whether the jury had found by their verdict, the facts, and the only facts held to be necessary by the Court of Errors, to entitle the plaintiff to a verdict?

3. Whether the deed from the plaintiff to the defendants authorized the latter to build their embankment without an opening, which plaintiff claimed should have been made to protect his buildings against floods?

4. Whether the defendants' motion for a *non suit* was properly overruled?

5. Whether the *judgments* and *opinions* of a portion of plaintiff's witnesses (not experts) were properly received in evidence?

6th. Whether the evidence of what the plaintiff said to the engineer of the defendants (who had charge of building the bridge), at the time of its construction, about its sufficiency, was properly received?

7. Whether, when the *opinions* of plaintiff's witnesses were called for, and the defendants objected that the evidence was *illegal* and *improper;* not that the witnesses were not men of science or skill, that they were not experts; that the objection went to the *nature of the evidence* or to the *qualifications of the witnesses*? Should the objection have been *distinctly taken*, that the witnesses were *not experts*, to have legally excluded their *opinions* as evidence.

John Brown, the defendant in error, sued the Mohawk and Hudson Rail Road Company in 1837, in an action on the *case for negligence*, in the construction of the defendants' Rail Road *embankment* and *bridge*, along and over Mill Creek in the city of Schenectady, by means whereof a flood in March 1832, swept away the bridge, and with it, the plaintiff's buildings and tannery which stood west of the embankment and bridge. The declaration contained seven counts.

As there was a question raised, on the second trial upon a motion for a non suit that the plaintiff's declaration was insufficient to cover the particular injuries proved, and it being held, that the *third* count was broad enough to cover such injuries. It is thought best to insert that count entire, as well for that reason, as to show generally the allegations of negligence in the declaration, which are substantially the same in each count, with changes to meet the several injuries complained of.

The third count was as follows:

*3d Count.*—And also for that whereas, on the day and year aforesaid, and for all the time aforesaid above mentioned, to wit, at the city and in the county of Schenectady aforesaid, the said plaintiff was lawfully possessed of divers tenements and closes, and also of a certain piece or parcel of land, situated, lying and being in the city and county of Schenectady aforesaid, and on which were standing and being divers fruit trees and fences, and to which also were appurtenant divers tan vats and wells of water, dug, made and fixed on the said piece or parcel of land of the said plaintiff, and through and along which said piece or parcel of land the said defendants, during all the time aforesaid, were possessed of and entitled (under and in pursuance of the

said act of the legislature which incorporated them), a certain rail road or way leading from the city of Schenectady aforesaid, to the city of Albany, and which said road or way, to wit, at the city and in the county of Schenectady aforesaid, passed over and across a certain creek or stream of water, running through a part of the said city of Schenectady, called Mill Creek; and during all the time aforesaid, the said defendants were of right and still are bound to make, keep and maintain their said road, way or passage over the said creek or stream of water in such a manner as that no damage or injury could arise or happen by means of the rise of water or ice, to the property or effects of any of the inhabitants of this state, through the want of care or by the negligence of the said defendants in that respect. Yet the said defendants, well knowing the premises, but intending unjustly to injure and prejudice the said plaintiff in this respect, to wit, on the said 16th day of March, 1832, and at the city and county of Schenectady aforesaid, and at divers other days and times between that day and the commencement of this suit, did wrongfully, negligently and unjustly suffer and permit the passage of their said rail road over the said creek, to be so unskilfully, insufficiently and unsafely and carelessly made, kept, maintained and continued, as that large quantities of ice and water, on the day and year last aforesaid, and at the city of Schenectady aforesaid, and at divers other days and times between that day and the commencement of this suit, by reason of such unskilfullness and want of care of the said defendants, worked and forced their way, and came against and upon the tenements, closes, and land aforesaid of the said plaintiff, by means whereof, divers, to wit, twenty-eight tenements of the said plaintiff of the value of twenty thousand dollars, then and there being in and upon the said land or real estate; together with forty tan vats of the value of one thousand dollars; one hundred fruit trees of the value of fifteen hundred dollars; one thousand rods of fence of the value of five hundred dollars, and a well of water of the value of two hundred dollars, then and there being on and affixed to the said land of the said plaintiff, were demolished, swept away, injured and lost to the said plaintiff, and he was thereby deprived of and lost his trade and business for all the time aforesaid, and all the pro-

Brown *agt.* The Mohawk and Hudson Rail Road Company.

fits which would have arisen therefrom, for the time aforesaid, to wit, at the city and county of Schenectady aforesaid, all which is to his great damage.

All which grievances, in this declaration mentioned, are to the plaintiff's damage of twenty-five thousand dollars, and therefore he brings suit, &c.

(*Plea.*)  And the said defendants by John V. L. Pruyn and Henry H. Martin, their attorneys, come and defend the wrong and injury, when &c., and say that they are not guilty of the said supposed grievances above laid to their charge, or any or either of them, or any part thereof in manner and form as the said plaintiff hath above thereof complained against them, and of this they, the said defendants, put themselves upon the country, &c.

The cause was brought to trial upon said issues at a Circuit Court held in Schenectady, before the Hon. JOHN WILLARD, circuit judge, on the 19th October 1838.

As this case involves important principles, in the construction of evidence, and the general rules of law applicable to the admissibility of and exceptions to evidence, as well as containing important testimony upon matters of fact in science skill and art, in the construction of bridges and embankments to protect against floods, &c.; it is thought proper, to do justice in preparing the case, to give the evidence *entire* on the first and second trials, together with the motions for non suit at the circuits and the decisions thereon.

This cause has been three times tried at the circuit, twice decided in the late Supreme Court, once by the present Supreme Court, once decided by the late Court of Errors and once by the Court of Appeals. (On the decision by the present Supreme Court, on appeal from the third trial, which was in favor of the plaintiff, it is understood the case was settled.)

Upon the trial, the counsel for the plaintiff to maintain and prove the issue on his part, gave in evidence as follows:

*Ephraim Benedict*, a witness for the plaintiff, being sworn, testified that he had resided in the city of Schenectady since 1812; was acquainted with the freshets in the Mohawk river and Mill creek; Mill creek runs from the east, westerly into the Mohawk river; has occupied a building over Mill creek, east of the rail road embankment of the defendants and west of the Erie canal, for upwards of twenty years.  There was at the time of the construction of the defendants' rail road embankment (which

was made in the fall and winter of 1831), a natural ravine, extending from the Erie canal, and near where Mill creek passes through a culvert under the canal, westerly to the Mohawk river. The east end of the ravine at the creek is four rods south of Mill creek,, and diverged from the creek as much as twenty rods, as it proceeded to the Mohawk. · The upper part of the bank of the creek is two feet higher than the ravine, and it was much wider than the channel of the creek. This ravine, before the Erie canal was built, extended from the east of the canal. The defendants constructed in the fall and winter of 1831, a solid embankment, from the north bank of the Erie canal, northerly to the compact part of the city of Schenectady, across the intervening flat with the exception of Mill creek, over which ·they built a wooden bridge. This embankment enclosed a portion of the flats adjoining to and south of the compact part of the city. The banks of the Erie canal formed the enclosure on the south and east. The high grounds of the city on the north and the rail road embankment on the west; the Mohawk river overflows the adjacent flats as often as once a year. In the spring the ice generally dams up at the Mohawk bridge and sets the water back upon the flats, and when the ice gives way, which it usually does suddenly, a fall in the river at the bridge of from five to twelve feet is created, which produces a strong current in the neighborhood of Mill creek; before the construction of defendants' embankment, when the ice dammed up at the bridge, it raised the river above and set the water up Mill creek, and over the said flats between the canal and the river, and when the ice gave way the water rushed from the flats by a strong current; the current rises in Mill creek and along the ravine. The ravine was a natural channel in times of floods. Defendants' embankment was built across the ravine. Witness saw the flood in March 1832. Has seen the waters on the flat, west of the defendants' embankment between it and the canal, previous to 1832, higher than it was in the spring of that year, when the plaintiff's buildings were taken away; has seen it higher as often as two or three times; once in 1814; has seen it nearly as high without ice at the bridge in 1832; the water east of the defendants' rail road embankment, was about as high as the embankment; in cases of

Brown *agt.* The Mohawk and Hudson Rail Road Company.

high water in the river, the water, notwithstanding the solid embankment of defendants, would set up Mill creek and fill the flat east of the embankment to a height equal to the water on the west, and in case of a sudden fall in the water at the bridge, the water would rush from the flat east of the embankment with a strong current, and must force its way through and along Mill creek, that being now the only outlet, as the rail road embankment was built solid over the ravine, from the creek to the canal. The plaintiff's buildings stood west of the rail road embankment, and directly west of the wooden bridge over Mill creek. This wooden bridge was taken off by the water during the said flood in 1832, and must have been borne against one of plaintiff's buildings. The plaintiff had buildings on both sides of the creek, west of the rail road embankment, which were carried off in the flood of 1832; the carrying off of the bridge naturally and inevitably swept away the plaintiff's buildings. The water in the range of the ravine wore away about two-thirds of the rail road embankment before the bridge gave way. In 1831, common prudence would have dictated the necessity of an arched stone bridge over Mill creek, and the leaving an opening in the defendants' embankment in the range of the ravine to protect the property west of the embankment. A stone bridge and an opening in the rail road embankment, would, as witness thinks, have saved plaintiff's buildings. The Erie canal was built in 1824; the banks of the canal are higher than the rail road embankment; has known the water to set up Mill creek from the river since 1832; no alteration has been made in the rail road embankment since 1832; and no particular damage has been done by high water; the high water in 1832, was caused by the damming of the ice at the Mohawk bridge, which extended up the river from one mile and a half to two miles; the extent of damming the ice was greater than witness ever before knew; the accumulation of ice was one and a half to two miles up the river; the ice was partially broken up before, and had stopt and frozen again; it lodged against the bridge and the water set back some; it remained in that situation some days and froze; there then came on a sudden thaw, and the water dammed up very high; the water set up and broke over the canal about two miles west of

Brown *agt.* The Mohawk and Hudson Rail Road Company.

the city; the water then washed down the canal and broke over the banks into the basin made by the rail road embankment, and washed away part of the canal bank; the buildings of Brown were not carried away by the water setting back up Mill creek; the great body of the water came down the canal; some may have set back; the water was running over the canal in so large a sheet in the morning, when witness first saw it, as to carry over a canal boat; never knew the water from the river before to come down the canal and run over its banks; saw a boat in the forenoon pass over the bank of the canal; witness would have built a stone culvert over Mill creek; it might have been made wider than the bridge; the space under the canal through which Mill creek passed was as wide as the space under the bridge, but not as high; the whole space in the flood of 1832, between the canal south to the hills, was filled with water, and was as high as on the flat north of the canal; plaintiff's buildings were swept away during the night and before witness got up in the morning; in the morning, no part of the canal bank had worn away; water was lower west of the rail road embankment than east; has seen the water south of the canal before 1832, as high as it was in the flood of that year; if the water had dammed at the bridge, the sudden breaking away of the ice would have created a current strong enough to have taken away the bridge over Mill creek; a current less strong than the one in 1832, would have taken away the bridge; an opening at the ravine would have saved the bridge and plaintiff's buildings; the water ceased to run over the canal in the forenoon; there is no deep ditch running across the flat as marked for the course of the ravine in the map produced here on part of plaintiff; Mill creek was walled in as it now is, before the rail road crossed it.

*John Elder*, a witness for the plaintiff being sworn, testified that he had been acquainted with the Mohawk river 16 years; witness built the bridge over Mill creek for the defendants; it was a wooden bridge; it rested upon wooden posts; the posts were fastened in wooden sills, and the sills rested upon the ground; the bridge was of the same width as the present bridge; there have been for many years two stone culverts over Mill creek west of the bridge, and between it and the Mohawk river, which have

always withstood the floods; during the building of the bridge by witness for the defendants, the plaintiff complained to the engineer who had charge of the section of the bridge for the defendants, that the bridge would be insufficient to protect his (plaintiff's) buildings; it was not, in witness's opinion, as erected, sufficient to withstand the floods witness had previously seen at that place; a stone culvert ought to have been built instead of it, and there should have been left an opening in the defendants' embankment in range of the ravine, as an outlet for the water; in the flood of 1833, the water was highest about four or five o'clock in the morning; plaintiff's buildings were carried away about one o'clock in the night; never saw the water as high before; the buildings of the plaintiff swept away, were a leather store, two curry shops, two bark houses, two wood sheds, a barn and a house, all worth about three thousand and thirty dollars; the opening at the bridge for the passage of Mill creek was larger than through the culvert at the canal.

On being cross-examined the witness says, the defendants' bridge over Mill creek was wider than the creek; it did not contract the passage way for the water; the opening of the bridge for the water was larger than the canal culvert above, over the creek; the water running out at the time of the flood ran the course of Mill creek; at the time witness built the culvert, he knew of no other water to provide for passing it, than that which ran through Mill creek and the culvert of the canal; never before knew the water to come over the canal and break through as it did at the time of this flood; witness was up all night and saw the water; his house was west of Brown's on Water street; it was on the bank of Mill creek and was injured; the water stopped rising about eight o'clock in the morning; the water east of the rail road, I think, did not begin to fall till three o'clock in the afternoon; in the afternoon before the injury, the water was rising east of the rail road, and the current of the water was down from the rail road passing my house; it continued rising that way till morning; had there been a stone culvert over the creek, the effect would have been, he thinks, to have washed the embankment through; he stated the value of the buildings as they were before removed for rail road; was not in them after

they were refitted, and does not know what their situation was.

Further direct examination, he deposed: before the rail road bank was made, the water, after it passed the canal and over-flowed Mill creek, took its course through the ravine which led quite to the Binne kill; the ravine was at the least four feet lower than the banks of Mill creek: the effect of the rail road embankment was to force every thing through Mill creek at Brown's buildings; has seen water as high in the Mohawk river as at that time. The bridge had been built in the winter; the freshet was on the 12th March 1832; sometimes the ice dammed against the Mohawk bridge, and set back as at this time; it did so about three years before; does not remember that water ever came in the canal before; previously it passed through the culverts under the canal to the south side of the canal; before the construction of the rail road embankment, the water used to spread over the whole flat; never knew any injury done to Mr. Brown's buildings before; the water took away his fences sometimes; if the bridge had held out against the flood, thinks it would have broken through above; if there had been a stone culvert of proper size, thinks it would have protected the buildings; an opening in the embankment at ravine, thinks, would have protected the buildings; most all of Mr. Brown's buildings were near Mill creek; some of them were moved to make room for the road, and built up before embankment was made.

*Joseph Gillespie*, a witness for the plaintiff being sworn, testified that he was present during the flood of 1832, when the bridge over Mill creek was carried off. The bridge giving away, swept off in its way, plaintiff's buildings; the nearest building was six or eight feet from the bridge; the buildings were about eight feet lower than the bridge; plaintiff's tan yard joined one bank of the creek west of embankment; it was six feet higher than the land south of it; plaintiff had tan vats in yard at the time of the flood; there were in the vats and buildings at the time, about fifteen hundred hides of leather; about one thousand were taken off by the flood; the rest were torn to pieces; a few of them were raised out of their beds and emptied of their contents; the five hundred sides that remained were injured to the amount of fifty cents a side; the thousand sides taken off were

Brown *agt.* The Mohawk and Hudson Rail Road Company.

worth three dollars a side; eight barrels of oil were taken off, worth fourteen dollars a barrel; five do. of tallow, worth eighteen dollars a barrel; one splitting machine and currying tools, worth two hundred dollars; two thousand horns worth three dollars a hundred; one thousand tails worth two dollars a hundred; three hundred bushels of lime worth fifty-four dollars; four sets of harness worth one hundred dollars; fifty empty barrels worth twenty-five dollars; one pleasure wagon worth one hundred and fifty dollars; two lumber wagons worth eighty dollars; one set of rollers worth ten dollars; eight hundred bushels of leather scraps worth eighty dollars; also three sleighs, one sulky, one gig, ten tons of hay, forty fowls, twenty-five fruit trees, one plow, one saddle, twelve cords of bark worth four dollars a cord.

*Cross-examined :* Says the bridge over Mill creek went off between one and two o'clock at night; the water had not then quite reached its height; the water had all the time been running from Mill creek into the river; the string pieces of the bridge were nine feet higher than the sills of plaintiff's buildings; when the bridge was carried away, it was forced against the nearest building and started the building; this building was boarded on the east side down to the sill; the water poured over the Northern canal bank all the way from the rail road to the city; the water had run over about three hours before the buildings went away; the water broke through the south bank of canal into it, about the same time it broke through the north bank nearly opposite; the river run over the canal about one and a half miles to two miles above the city; the canal and hills on south form a large basin half a mile wide; these flats were covered.

*John Kelly,* a witness for plaintiff being sworn, testified that he saw the bridge over Mill creek taken off by the water; as it went off it struck the corner post of the curry shop of the plaintiff; the post gave way and the building fell, and they took the other buildings with them; thinks the water did not rise higher east of the rail road after this; it rose higher below after the bridge went away than it was before; the water broke through the banks of the canal three hundred feet west of the rail road; thinks the water on south side of canal was as high as the south bank; when the bridge went away there was a strong current in

Mill creek running down; a stone culvert over Mill creek, and an opening in the rail road embankment in range of ravine would, he thinks, have saved Brown's buildings; there was no building near the culvert under the canal.

*Cross-examined* · Witness is acquainted with the ground in the vicinity of Brown's property; Church street has been laid out since the freshet, across the flats to the canal, nearly parallel with the rail road; it is embanked and raised up solid like the rail road, and no opening left in it at the ravine spoken of; thinks the bridge at Mill creek at church street, a little higher than the rail road bridge; the embankment and grade of the street is higher; it is a wooden bridge, and no longer across the stream than the rail road bridge; it is wider up and down than the rail road bridge; has known the Mohawk river at Schenectady about twenty years; some years ago knew the water once by the damming of the ice in the river at the head of the island, to come into the canal, but it did not break through it; does not recollect the year; thinks the water to be guarded against in making the bridge, was the back water and the water of Mill creek; the culvert under the canal for Mill creek is a pretty good culvert; it is from eight to ten feet at the base.

*Direct :* In case of high water, the water sets up through the culvert above under the canal, and goes on south side; thinks there are three culverts under the canal between the city and the first lock above, about $2\frac{1}{4}$ miles; the canal banks are higher near the city than at the city; the flats descend; the water does not rise high in Mill creek, independent of the floods in the Mohawk; the creek is supplied by springs principally.

*Abraham Van Ingen*, a witness for the plaintiff being sworn, testified that he is a native of the city of Schenectady; he saw the flood in 1832; has seen the water east of the defendants' rail road higher than it was then; once in 1814; witness then lived in Washington street; has also seen the water higher previous to 1814; once previous to 1789, when it was as high as Wendell's gate in Mill lane, which was several feet higher than it was in 1832; since the building of the Mohawk bridge the ice frequently dams up there and throws the water back on to the flats, and when the ice gives way a strong current is produced;

Brown *agt.* The Mohawk and Hudson Rail Road Company.

before 1832 the river dammed up to the heads of the islands; and the water ran into the canal as it did in 1832, but did not break over the banks; the ravine spoken of by the witnesses, was the natural channel in floods for the water to take in passing off; as far as I am able to judge, a stone culvert across the creek would have been necessary to protect the neighboring owners, and an opening should have been made at the ravine; floods seen by witness previous to 1832 would have taken off the wooden bridge built by defendants over the Mill creek; a wooden bridge was insufficient, in his opinion to protect the property west of it, and particularly after the construction of the rail road embankments; an opening at the ravine would have saved plaintiff's buildings; an opening in the rail road bank would, I think, have saved plaintiff's buildings; thinks prudence would have dictated the necessity of a stone bridge and an opening in the bank; in his opinion a stone bridge would have let the water off so gradually as to have saved the plaintff's buildings.

*Cross-examined :* Does not know the width of the bridge; does not know of any other water to be provided for to pass through the bridge than the back water, and that passing through the culvert under the canal; never saw any other before 1832. The act incorporating the defendants, passed April 17th, 1826, was introduced in evidence, and may be referred to by either party.

A map was also introduced by the defendants, which was proved to be an accurate representation of the plaintiff's premises and the contiguous grounds, and which shows the course and operation of the flood referred to, and the places at which it broke over the banks of the canal, which map may be used by either party.

Here the plaintiff rested; whereupon the counsel for the defendants then and there, insisted before the said circuit judge that the said several matters so produced and given in evidence on the part of the plaintiff as aforesaid, were not sufficient, and ought not to be allowed or admitted to entitle the said plaintiff to a verdict. And the counsel for the defendants then and there insisted before the said judge, that the plaintiff ought to be non suited; but to this the counsel for the plaintiff did then and there

insist before the said judge, that the said several matters so pro-
duced and given in evidence as aforesaid, were sufficient and
ought to be admitted and allowed as evidence, to entitle the said
plaintiff to a verdict.   And the said counsel for the plaintiff then
and there insisted before the said judge, that the said several
matters as produced and given in evidence as aforesaid, ought to
be submitted to the jury, in order that they among other things,
might determine whether the defendants had been guilty of
negligence and want of ordinary care and skill in the construc-
tion of their said rail road embankments and bridge, and whether
the destruction of the plaintiff's buildings and property was, or
was not the necessary result of such negligence and want of or-
dinary care and skill.

And the said circuit judge did then and there declare and de-
liver his opinion, that the said several matters so produced and
given in evidence on the part of the plaintiff as aforesaid, were
not sufficient, and ought not to be admitted and allowed to go
to the jury as evidence, to entitle the plaintiff to a verdict; and
the said judge did then and there non suit the plaintiff.   Where-
upon the counsel for the plaintiff did then and there, on behalf
of the plaintiff, except to each and all of the aforesaid opinions
and decisions of the said judge.

At the May term, 1840, of the Supreme Court, the bill of ex-
ceptions, which had previously been argued, was decided, and a
new trial *denied.*

The following is the opinion of the Supreme Court:

NELSON, Ch. J.—The defendants having a right, by the act of
incorporation, to build the embankment and bridge over Mill
creek, the only question in the case is, whether the work has been
so negligently and unskillfully done as to have occasioned the
injury complained of.   If not, and it has been brought about by
an act of providence, which neither human foresight nor care
could reasonably guard against, the calamity is the misfortune
of the plaintiff, and it would be something more than unjust to
transfer it to another.

It is insisted as a ground of negligence, that the defendants
should have built a stone bridge, strong enough to have resisted

Brown *agt.* The Mohawk and Hudson Rail Road Company.

the accumulation of the waters, or made a culvert under the embankment, so as to have divided their force. It is believed by some of the witnesses, that this precaution would have saved the bridge, and consequently the plaintiff's buildings.

There is no great difficulty in suggesting precautionary methods after the calamity has happened. The question is, whether they ought to have occurred to the party before. It is conceded that the flood came from a quarter unknown since the erection of the canal, and in unusual and almost unprecedented quantities, as but two such had occurred before, within the memory of man.

As it was never known to overflow the canal banks the only water to be provided for, in common prudence, was that forced up the creek through the span of the bridge by the rise of the Mohawk, or coming down the stream through the canal culvert. There is no reason to doubt its sufficiency for these purposes. The opening is greater than that afforded by the culvert, and nearly equal to that of the bridge over this creek in Water street. But be this as it may, no one, I think, can read the evidence in the case, and not be satisfied that the loss of the plaintiff has happened from most extraordinary natural causes, such as rarely occur, and which human foresight is no more expected to guard against, than against the devastation of tempests, or some sudden convulsion of nature. New trial denied.

Brown, thereupon, sued out a writ of error, and brought up the judgment of the Supreme Court, to the Court for the Correction of Errors.

The cause was argued at Albany in November term, 1842.

*Platt Potter*, attorney. *A. Taber* and *Joshua A. Spencer*, counsel for plaintiff in error.

The points of plaintiff in error can not be obtained. They are lost or mislaid.

*Pruyn & Martin*, attorneys. *John V. L. Pruyn* and *Samuel Stevens*, counsel for defendants in error.

*First.* The embankment and bridge over Mill creek were constructed by the defendants with all requisite skill and care, and in a manner entirely sufficient to provide for all the water that could reasonably be expected at any time to pass through that channel.

Brown *agt.* The Mohawk and Hudson Rail Road Company.

*Second.* The freshet in the Mohawk river in 1832, which occasioned the damage complained of, was so unexpected and extraordinary in its character and extent, that it could not have been foreseen or guarded against, but was an act of providence by which the plaintiff as well as many others suffered; and in the language of the chief justice, " it would be something more than unjust to transfer its consequences to another."

*Third.* The evidence being uncontradictory, and not authorizing a verdict for the plaintiff, it was the duty of the judge to grant a non suit.

On the 28th December 1842, the judgment of the Supreme Court was *reversed and venire de novo awarded,* by the Court of Errors.

The following are the opinions delivered by the Court of Errors:

THE CHANCELLOR.—The only question in this case is, whether the testimony given upon the trial of this cause, which was all on the part of the plaintiff, was sufficient in point of law to authorize the jury to find a verdict against the defendants. Although the jury is the constitutional tribunal to decide disputed facts, it does not follow that the court must submit every question of fact to their decision as a matter of course, although the party holding the affirmative has failed to introduce sufficient evidence in point of law to authorize the jury to give a verdict in his favor. Hence it is the duty of the court, if requested by the defendant to do so, to non suit the plaintiff, where the testimony is all on his side, and where it is wholly insufficient to sustain the suit. And it is insufficient in point of law to sustain the suit where it would be the duty of the court to set aside the verdict and grant a new trial, if the jury find a verdict in favor of the complainant. But where the testimony is sufficient to sustain a verdict in favor of the plaintiff, if the jury should find one in his favor, the questions of fact should be submitted to their decision; although the judge who tries the cause may think the evidence leaves the case in so much doubt that the jury would be fully justified in finding a verdict for the defendant.

Brown *agt.* The Mohawk and Hudson Rail Road Company.

In the case under consideration, the plaintiff was bound to establish two facts, to entitle him to a verdict: *First,* that the defendants' agents had been guilty of negligence in the construction of their viaduct bridge over Mill creek. In other words, that it had not been constructed with that ordinary care and prudence which other people are in the habit of exercising in relation to their own property, and that of their neighbors similarly situated, taking into consideration the floods which might reasonably be expected from the damming up of the ice against the piers of the Mohawk bridge, and otherwise. And, *Secondly,* that the property of the plaintiff would not have been destroyed by the extraordinary and unprecedented flood which did occur, if this viaduct bridge had been so constructed, as to render the property of the plaintiff, and of the adjacent owners safe as against such freshets as might reasonably have been anticipated. That the immediate cause of a part of the injury to the plaintiff's property was the carrying off of the defendants' bridge, is pretty satisfactorily established by the evidence. Whether the same result would not probably have been produced by the damming up of the water and ice, until it overflowed and carried away the embankment, if there had been an immovable stone culvert over Mill creek, is a question to which the attention of some of the witnesses does not appear to have been particularly directed, and which may be a legitimate subject of inquiry if a new trial shall be granted.

The question, whether the evidence was sufficient to authorize the jury to say the bridge was such as to endanger the adjoining property in ordinary freshets, occasioned by the damming up of the ice in the usual manner at the Mohawk bridge, and setting the water back in Mill creek, is one which is more doubtful. And I think the Supreme Court was right in supposing that the defendants, in building their road, were not legally bound to guard against such an unusual and unlooked for occurrence, as the great flood of March 1832. For if that was the case, the state would probably be liable to make good the loss which this complainant and others sustained at that time; as the canal and its embankments unquestionably prevented the waters of the river from returning into their accustomed channel above the city,

Brown *agt.* The Mohawk and Hudson Rail Road Company.

and thereby greatly increased the volume of water which was thrown against the east side of the embankment, upon which the defendants' rail road was laid. But as I understand the testimony of Mr. Van Ingen, and some of the other witnesses, they meant to be understood that ordinary care and prudence required that there should have been an immovable stone bridge across Mill creek, and a culvert in the embankment, to protect the plaintiff's buildings from danger from the common floods occasioned by the damming up of the ice at the Mohawk bridge, which was a case of frequent occurrence, and one, therefore, which the defendants were bound to guard against. If the witnesses did not mean that, it is difficult to conjecture what they did mean, in saying that ordinary prudence would have dictated these precautions. For I do not believe any of these witnesses could have been so stupid as to suppose that ordinary prudence requires that we should guard against an extraordinary dispensation of providence, which common human foresight could not have anticipated. Viewing this testimony in the light therefore, in which these witnesses must have intended the jury should understand it, I think it was such as should have been submitted to the jury to decide upon.

For this reason, I think, the judgment should be reversed, and a venire de novo awarded.

OPINION OF THE PRESIDENT. BRADISH, Lt. Gov.—" *Sic utere tuo ut alienum non lædas,*" is a sound maxim in the law, and is particularly applicable in the present case. The defendants in error are the grantees in an important public franchise. In the enjoyment of this valuable and exclusive privilege, it was especially incumbent upon them, so to exercise their own rights as not to injure or impair the rights of others. It was their duty to exercise such forecast and precaution in the construction and use of their work, as that the property of others, using ordinary prudence, should remain safe from any danger or injury therefrom. The question in this case then, is, have the defendants, in the enjoyment of their exclusive franchise, exercised such forecast and prudence, not merely in the erection of the bridge in question, but in the construction and management of their entire

work, so far as regards the interests involved in the present case; or whether they have been guilty of such negligence, as to have occasioned the damage complained of, and rendered themselves liable therefor to the plaintiff in the present action?

It is in proof that there had been repeatedly higher floods than that of 1832, which caused the damage alleged in this case. But the water of those floods had been safely discharged through Mill creek, and the ravine in its neighborhood. This ravine, the defendants, in the construction of their work in 1831, occupied by a high solid embankment, without culvert. In thus closing this natural estuary, through which the high floods had formerly safely discharged themselves, they forced those floods through Mill creek, as their only outlet.

This rendered it especially requisite that the defendants should have provided increased facilities and safe means for the discharge of the waters through Mill creek; such increased facilities and safe means were not provided by them. The slight wooden structure placed there, was wholly insufficient for that purpose. We have the testimony of several witnesses to this effect. One who had resided at Schenectady for thirty years, testified that "in 1831 common prudence would have dictated the necessity of an arched stone bridge over Mill creek, and the leaving an opening in the defendants' embankment, in the range of the ravine, to protect the property west of the embankment. A stone bridge and an opening in the rail road embankment, would, as witness thinks, have saved the buildings." Another witness, who had been acquainted with the Mohawk at that point for sixteen years, and who was the mechanic who built the wooden bridge in question, testified that "during the building of the bridge by the witness for the defendants, the plaintiff complained to the engineer who had charge of the section of the bridge, for the defendants, that the bridge would be insufficient to protect his (plaintiff's) buildings; it was not, in witness's opinion as erected, sufficient to withstand the floods witness had previously seen at that place; a stone culvert ought to have been built instead of it, and there should have been left an opening in defendants' embankment, in range of the ravine, as an outlet for the water." Another witness testified that " a stone culvert over Mill creek,

and an opening in the rail road embankment in range of the ravine, would have saved Brown's buildings." Another witness who was a native of Schenectady, and must have passed a long time there, as he speaks of having seen a high flood, which happened there previous to 1789, testified that "the ravine spoken of by the witnesses, was the natural channel in floods, for the water to take in passing off;" that "a stone culvert across the creek, would have been necessary to protect the neighboring owners, and an opening should have been made at the ravine," that "floods seen by witness, previous to 1832, would have taken off the wooden bridge built by defendants over Mill creek;" that "a wooden bridge was insufficient, in his opinion, to protect the property west of it, and particularly after the construction of the rail road embankments; an opening at the ravine would have saved plaintiff's buildings; thinks prudence would have dictated the necessity of a stone bridge, and an opening in the bank; in his opinion, a stone bridge would have let the water off so gradually as to have saved the plaintiff's buildings."

Now, I think it can hardly be denied, that this testimony taken together, at least tended to prove the averments of the plaintiff's declaration, and to show that "the defendants have been guilty of negligence, and want of ordinary care and skill in the construction of their rail road embankments and bridge," and that the destruction of the plaintiff's buildings and property was the necessary result of such negligence, and want of ordinary care and skill. It is true that a portion of this testimony consists of the expression of opinion after the events had happened, which tended to show the correctness of that opinion; and that such testimony should be received with caution, and always with more than grains of allowance; that a prophecy which follows its own fulfillment, even if it prove its own verity, is not well calculated to inspire a high confidence in the inspiration that dictated it.

Yet, I think, notwithstanding this, that the testimony in this case taken altogether, was of such a character and degree, as fairly to entitle the plaintiff to the verdict of a jury upon it, and that it should have been submitted to the jury for that purpose.

The circuit judge erred, therefore, in withholding the testimony from the jury, and in ordering a non suit. This seems to me so

Brown *agt.* The Mohawk and Hudson Rail Road Company.

clear that I do not think it necessary, in the decision of this case, to invoke the important principle of preserving the proper jurisdiction of the jury against the increasing tendency of the courts to encroachments upon and usurpation of that jurisdiction; nor to appeal to that other principle, scarcely less important, that in case of doubt, it is better to lean in favor of the jurisdiction of the jury, and thus preserve, in its utmost extent, *the trial by jury ;* an institution not more essential to private rights, than it is vital to a sound, safe and practical administration of public justice.

This case seems to me free from difficulty, and its decision to be within ordinary, well settled and acknowledged principles.

In conformity with these views, I am of opinion that the judgment of the Supreme Court, affirming the decision of the circuit judge, and denying a new trial, is erroneous, and should be reversed, and a venire de novo awarded, with costs to abide the result.

OPINION OF FRANKLIN, Senator.—The courts of this state have recognized and established the doctrine, that a judge may non suit a plaintiff, when, in his judgment, if the jury had passed upon the case, and found for the plaintiff, they would have interfered and set aside the verdict as not warranted by the evidence; but in order to justify the setting aside of a verdict upon such grounds, it must be a clear and palpable case, and one in which there can be no reasonable grounds for doubt. In the case of *Woodward* v. *Paine and Lake*, (15 *John. R.* 493), the court denied a motion for a new trial, because from the nature of the cause, and the testimony that was given, there was room for an honest difference of opinion depending very much upon the credibility of witnesses; and they held that the question was fairly submitted to the jury. So in the case of *Foot* v. *Sabin* (19 *John. R.* 158), Chief Justice Spencer, in delivering the opinion of the court, laid down this rule in deciding an application to set aside a non suit: It was the duty of the judge to non suit the plaintiff, when, in his opinion, the evidence offered by him did not support his action, *and there were no questions of fact to be weighed and considered by the jury ;* and if courts can rightfully non suit the plaintiff upon an *undisputed* state of

Brown *agt.* The Mohawk and Hudson Rail Roau Company.

facts, when the law is against them, they ought to do so; or where the evidence adduced *entirely fails* to make out the case of the plaintiff. Graham, in his treatise on practice, page 632, says: it is a well established rule, that courts will refuse to grant a new trial, unless the verdict is *manifestly and palpably* against the weight of evidence, even though it be directly contrary to the charge of the judge. Wherever there is room to doubt, the court will not grant a new trial, because the inclination of their opinion is at variance with the verdict of the jury. Again, in his work on new trials, he says: Facts are peculiarly the province of the jury; whether the proof offered be competent, is for the court; whether it be sufficient, when produced, is for the jury. It may be regarded as a proposition containing a rule of universal application, that where an issue of fact is fully and fairly submitted upon its merits, and the jury, in the free exercise of a sound judgment pass upon it, their verdict shall stand. Lord Ellenborough in the case of *Carstain* v. *Stein* (4 *Maule & Selwyn*, 192), holds a similar doctrine with the courts of our own state, in which he says, the question is, not whether the verdict given, is such a one as we ourselves would have given, but whether having been given by a jury to whom the whole case was fully left in point of fact, and to whom the law upon the subject was fully stated, it ought to be set aside, and a new trial granted. The court will not interfere, unless to remedy some *manifest abuse*, or to correct some *manifest error* in law or fact, and thereupon denied the motion. In the case of *Swain* v. *Hall* (3 *Wilson's R.* 45), Chief Justice Wilmot lays down this rule: That where verdicts have been given contrary to evidence, or where there hath been no evidence at all to support a verdict, the court hath granted new trials; but if there hath been a contrariety of evidence on both sides, the court have never granted new trials, notwithstanding the judge before whom the cause was tried, hath been of opinion that the strength and weight of evidence were against the verdict. Now applying these familiar and well established principles of law to the case under review: Was the evidence offered by the plaintiff below, of such a character that the Supreme Court would have felt called upon to have interfered and set aside a verdict found for the plaintiff? Would

it have presented a case so clearly and palpably contrary to the evidence, as to have justified them in interposing the strong arm of the law, to arrest the verdict of that jury? For, if the testimony was of such a character as to have prevented them from interfering with the verdict if rendered for the plaintiff, then, in my judgment, the circuit judge committed an error in granting the non suit, but should have allowed the testimony to have gone to the jury, to be passed upon by them; for they are emphatically the judges of the facts, and it is their peculiar province to weigh and examine the evidence produced to establish the facts which they are called upon to try.

Now, what are the facts in this case, and what evidence was adduced, which the plaintiff claims he had a right to have the verdict of a jury upon? The action in the court below was brought by John Brown, the appellant, against the Mohawk Rail Road Company, for damages alleged to have been sustained by him in consequence of the manner in which that portion of the road of said company, which passes over Mill creek, had been made, kept, maintained and continued; by means of which, certain tenements and other property belonging to him, were demolished, swept away, injured and lost. And the question submitted was whether the defendants had been guilty of negligence and want of ordinary care and skill in the construction of their rail road embankment and bridge, and whether the destruction of the plaintiff's buildings and property was or was not the necessary result of such negligence and want of ordinary care and skill, as under all the circumstances of the case to render them liable to respond to him in damages for the injury which he had sustained. For the purpose of establishing those facts, it was proved by the person who built the bridge, that it was a wooden one; that it rested upon wooden posts which were fastened upon wooden sills, and that the sills rested upon the ground; that during the building of the bridge, he (the plaintiff) complained to the engineer who had charge of the section of the bridge for the defendants, that it would be insufficient to protect his buildings, and that it was not, in the opinion of the witness sufficient to withstand the floods which he had seen at that place. It was also proved that the bridge was

swept away by the freshet which soon afterwards occurred, and that the carrying off of the bridge naturally and inevitably swept away the plaintiff's buildings. That a stone bridge and an opening in the rail road embankment would have saved the said buildings. That the bridge was built in 1832, and that common prudence would have dictated, in 1831, the necessity of an arched stone bridge over Mill creek, and the leaving an opening in defendants' embankment in the range of the ravine, which was not done, to protect the property west of the embankment. That a current less strong than the one of 1832, would have taken away the bridge. That an opening at the ravine would have saved the bridge and plaintiff's buildings. That there was at the time of the construction of the rail road embankment a natural ravine extending from the Erie canal, and near where Mill creek passes, a culvert under the canal, westerly to the Mohawk river. That the waters on the flats west of the defendants' embankment, between it and the canal, previous to 1832, had been higher than it was in the spring of that year, when the plaintiff's buildings were taken away. That it had been higher two or three times. That it had been nearly as high without ice at the bridge in 1832. That the water had not quite reached its height when the bridge was carried away.

It is a well settled principle of law, that in the construction of roads and bridges, ordinary care and prudence are required in reference to all the surrounding circumstances; that the work be performed in such a manner as that no injury shall happen to the public or to individuals; and whether such care and prudence have been exercised, can only be determined by the testimony of those who are familiar with all the circumstances connected with the location and construction, and they are clearly matters of fact, upon which parties litigant have a right to the judgment of a jury, selected from the body of the county where the supposed injury happens in consequence of the want of care and prudence which the law contemplates and requires.

In reference then to the present case, whether the character of the Mohawk river—the ice dams which formed every year against the bridge erected across it—the consequent sudden elevation and depression of the water—the location of the plain-

tiff's buildings and property, and their exposure to its concentrated rush, warranted such a construction as was there erected—whether the road, with only a single aperture through it, and that directly opposite to his buildings, was such as the nature of the case required—whether it should or should not have been made with an opening at the ravine—the bridge have been of stone or wood—or if such a structure would have saved the property injured and destroyed, and the company was required to build such an one—or in fact whether under all the circumstances of the case, and the means of information within their power, they used that degree of care and prudence which they should have done, and which the law will compel them to do, or answer for their neglect in damages to the party injured, are strictly questions of fact, depending upon evidence coming directly within the province of a jury to decide, and should have been submitted for their judgment and decision; for it is not to be presumed that the learned judge who presided at this trial, was as well qualified to pass upon the form, structure and durability of this bridge, or whether it was calculated to protect the property of the plaintiff, and the other facts and circumstances in the case, as twelve men residing in the neighborhood could be. It was a matter of opinion to be formed upon testimony, and the plaintiff possessed the right to have the judgment of those twelve men upon the testimony which had been or might be taken in the cause.

The chief justice, in delivering the opinion of the Supreme Court, says the only question in the case is, whether the work has been so negligently and unskilfully done, as to have occasioned the injury complained of. This, then, is a matter of fact; and who so well qualified to pass upon it, as a jury of the country? To my mind, it is clearly within their power and authority, and should have been submitted to them; for the right of trial by jury is a sacred and inalienable right, guaranteed to every man in the community. It is the vital principle of the common law; the law of this state, and the constitutional right of every citizen, and should be guarded with a watchful and a jealous care, lest its privileges should be abridged.

Upon these views of the case, I have been unable to arrive at any other conclusion, than that the circuit judge erred in with-

Brown *agt.* The Mohawk and Hudson Rail Road Company.

drawing the case from the jury, and that the judgment of the Supreme Court, in refusing the application for a new trial, should be *reversed.*

Judgment reversed, and venire de novo.

*For Reversal.*—The Lieut. Governor, the Chancellor, Bockee, Corning, Deniston, Ely, Faulkner, Franklin, Hunt, Hunter, Johnson, Nicholas, Rhoades, Root, Ruger, Scott, Works,—17.

*For Affirmance*—0.

The Chancellor and Senators Franklin and Root, delivered written opinions, and Lieut. Governor delivered an oral opinion in favor of reversal.

The cause was tried the second time at the Schenectady circuit, before the Hon. PHILO GRIDLEY, circuit judge, on the 10th of March 1843.

The following testimony on the part of the plaintiff was introduced:

*Ephraim Benedict,* sworn on the part of the plaintiff, testified that he lived in the city of Schenectady since 1812, and owns property in the neighborhood of the flats, between the canal and the city, and north east of the rail road. Mill creek runs from east to west into the Mohawk river; it passes under the canal south west of the city. Witness has occupied a building standing on the bank of Mill creek above the pond, about half way between the rail road and canal, since 1812. Mill creek enters into the Binnie kill, which is an arm of the Mohawk river. Witness can not state where the swale strikes the Binnie kill; about half way between Abram Switz's and the road that goes up the river; Switz's house and shop are near together; there were no buildings in the range of this ravine in 1832; this swale was from two to three rods in width, and nearly three feet deep, he should think; in high water, before the rail road was built, the greatest portion of the water went off through this ravine or swale; buildings never sustained any injury from floods, to his knowledge, before the erection of the embankment for the Mohawk and Hudson Rail Road; in 1832, if there had been no embankment there, the flood would have passed off in the usual way. After the construction of the rail road the only outlet for the water was through Mill creek; the rail road embankment

Brown *agt.* The Mohawk and Hudson Rail Road Company.

was solid, and extended from the canal to the high grounds of the city, with no opening except that of Mill creek; Mill creek passes under the canal through a culvert. This swale or ravine had been on the flat as long as witness can remember; its east end is but a few feet south west from Mill creek; at the rail road embankment it was several rods from the creek; witness should think nearly half way between the creek and the canal. The channel of Mill creek is walled up, and is from eight to ten feet wide; where it is not walled up it is wider; the ravine is much wider than the creek is where it is walled up. The rail road embankment on the west, canal on the south, and the high ground of the city on the north, formed a triangular basin containing an area of about five acres, the only outlet to which was at the rail road bridge, across Mill creek. The rail road embankment and bridge were constructed in the fall of 1831 and winter of 1832. The bridge was of wood; never examined it particularly, but thinks it rests on wooden posts. The Mohawk river generally flows back on the flats once a year, sometimes twice a year. The Mohawk bridge was built before witness came to Schenectady to reside (1812); when the river breaks up, ice dams are formed at the bridge, and the water sets back up Mill creek and covers the whole flat; thinks he has known the water from five to fifteen feet on the flats before rail road was built; has seen more water in the river than he saw in it in the flood of 1832; he has known the water higher on the flats than it was then; witness recollects one time in particular, it was in 1814; witness thinks he has seen the water nearly as high on the flats as it was in 1832, without any ice dam. When the flats are overflowed by an ice dam at the bridge, the water sets up Mill creek and fills the basin, and if the dam gives way suddenly, a strong current would set towards the river; has often seen such an occurrence. The plaintiff had a tan yard and several buildings on the banks of Mill creek, near to and west of the rail road embankment; some of the buildings had been removed to make the track of the rail road.

The rail road bridge was carried off in the flood of 1832; the plaintiff's buildings were also swept off; the bridge could not have been carried off without hitting plaintiff's buildings. The

water came into this basin in the flood of 1832, by running over the canal and through the Mill creek culvert; the Mohawk river had got dammed up by the ice at the west end or head of an island in the river, a mile and an half above the city of Schenectady; witness thinks this dam extended all the way down to the bridge. This dam forced the water of the Mohawk river into and over the canal, and filled up the flats south of the canal between the canal and the hills even with the canal bank. The Erie canal was completed from 1821 to 1824; the ice has formed dams west of the islands, so as to throw the water on to the flats, before the canal was made, but since the canal was built has not known the water to be thrown over the canal on to the flats on the south side of it, by dams or otherwise; nor does he know the water of the river ever being thrown into the canal by means of those ice dams, until the spring of 1832; the water has passed through the culverts under the canal on to the flats, on the south side of the canal, in consequence of the formation of these ice dams.

The counsel for the plaintiff put the following question to the witness:

*Question.   How could the rail road embankment have been constructed so that, in your judgment, it would have protected the plaintiff's buildings?*

This question was objected to by the defendant's counsel upon the ground that it was irrelevant and impertinent to the issue to be tried, and also upon the ground that the inquiry was as to the opinion or judgment of the witness, which was not legal evidence to go to the jury.

But his honor, the circuit judge, decided that the inquiry was legal, pertinent and proper; and overruled the said objection thereto, and directed the question to be answered.

To which decision and opinion the counsel for the defendants excepted, and the witness answered:

" By building a stone culvert over Mill creek, and another at the ravine, under the rail road bank, for the water to pass off by."

On being cross-examined the witness further testified that the ravine spoken of by him, run through the lands of plaintiff and

Brown *agt.* The Mohawk and Hudson Rail Road Company.

of the Campbell estate. It was pastured; don't recollect whether there were any apple trees set in it or not.

The water run over the canal at the freshet in 1832, between Mill creek and the city, near How's store, made a hole in the bank there; it also run over the canal quite a distance; was not confined to one place; at a place close by and north of the rail road. Plaintiff's buildings were carried off in the night. Witness left his buildings on Mill creek the day before the flood, near night, and did not return till the next morning, and then plaintiff's buildings were gone and the water was pouring over the canal. The ice had not given way at the Mohawk bridge or in the river the next morning. The water continued rushing over the canal till near noon; if the ice dam had given way in the river, the water would have run off down the channel of the river. The water also broke over the canal west of the rail road near Rotterdam street, and run across the flats into the river from that point. When the water stopped running over the canal into the basin, it remained high in the basin and on the flats all that day and the day following; the water was so high in the river that it could not drain off the flats.

There was a strong current setting down Mill creek after the water ceased to run over the banks of the canal. About nine o'clock in the morning witness went down to plaintiff's buildings; saw they were gone, and that the top of the bridge was gone also; had not been down there within the last twenty-four hours previous to that time; that is all he knows how either the buildings or bridge went off.

Church street crosses Mill creek just above the rail road bridge; has seen the Church street bridge repeatedly; it is a wooden bridge; it was built five or six years ago, or more perhaps; it is about the same size of the rail road bridge; the rail road bridge was immediately rebuilt of wood; both bridges have stood ever since; they stood through the floods of 1839, '40 and '41, when the water was as high as it was in 1832, but it did not run over the canal so much as it did then. In 1832 there was a thaw in January; the ice broke up and dammed; then froze again, and afterwards the ice broke up a second time in March and dammed at the head of the islands, and threw the water into and over the

canal, and filled up the flats south of the canal; large masses of
ice and timber were thrown from the canal into the basin.    Wit-
ness is a hatter and wool dealer.    Last spring the water rose ten
feet above the level of the flats at the old city mills, which wit-
ness now owns,

On being reexamined by plaintiff's counsel the witness further
testified that previous to the flood of 1839 there were substantial
stone walls built upon each side of Mill creek, laid in mortar or
cement, just above and joining Church street bridge, and an en-
gine house built over and on these walls; these walls were higher
than the bridge, and were 18 inches thick, as I think.

On being again cross-examined, he testified that Church street
continued is a solid embankment, like the rail road, and running
to the canal very nearly parallel with the rail road, and but a
short distance up Mill creek from it without any opening in the
embankment, except the bridge at Mill creek.

*John Elder*, sworn on the part of the plaintiff, testified that
he was in 1832 a carpenter and joiner, and was employed by the
defendants to build the bridge in question, over Mill creek.    It
was built in the winter of 1832.    It was built of hemlock timber.
It was constructed with four mud sills; two on each side of the
stream; the inside sills on those nearest to each side of the creek,
were twenty-four or five feet apart, so as to leave the opening or
stretch of the bridge across the creek 24 or 25 feet wide.    The
two outside sills were laid parallel with the inside sills, twelve
feet back from them; wooden posts were framed into these sills,
and plates framed on to the top of the posts, and the string pieces
placed on the top of the plates, and the flooring laid on those
string pieces; there were no fastenings of the sills to the ground.
The channel of the creek under the bridge was from eight to ten
feet wide, and was walled up on each side.    The plaintiff's
buildings were west of the rail road, and on both sides of Mill
creek; one building stood close up against the embankment, so
that it only left a space of six or seven feet between the top of
the bridge and the buildings.    The bridge was eighteen feet
wide.    There were two stone culverts over Mill creek west of
the bridge, prior to 1832; witness believes they are there yet.
Witness has been acquainted with that part of the city over

Brown *agt.* The Mohawk and Hudson Rail Road Company.

twenty years. [Witness heard the plaintiff say to Mr. Crane (one of the defendants' engineers), while the bridge was building, that "defendants had agreed to build a stone bridge or culvert, and he did not want a wooden bridge; that he did not think that bridge was sufficient; they had agreed to build a stone bridge, and he wanted them to do it." That was all that was said; nothing was said about exposure of plaintiff's buildings to the water.]

The questions which elicited the testimony included in brackets, and the said testimony, was objected to by defendants' counsel as illegal and inadmissible.

But his honor, the circuit judge, overruled the objection, and admitted the evidence.

To which decision and opinion the counsel for the defendants excepted.

The plaintiff's counsel then inquired of the witness *whether, in his opinion, the bridge was sufficient to stand the ordinary freshets, which witness had seen at that place previous to* 1832? This inquiry was objected to as inadmissible and illegal, that the opinion of the witness could not be evidence in the case. But the objection was overruled by his honor, the circuit judge, and the inquiry and the question permitted to be put to the witness.

To which decision the defendants' counsel excepted.

The witness in answer to said inquiry, testified that he did not think the bridge was sufficient to withstand the floods he had seen prior to 1832. Witness thinks there should have been a stone arch bridge over Mill creek, and a culvert in the embankment at the ravine.

Plaintiff's counsel then asked the witness *how, in his opinion, the embankment for the road and the bridge could have been constructed so as to have protected the plaintiff's buildings?*

This inquiry was objected to by the defendants' counsel as illegal and improper, but the objection was overruled by his honor, the circuit judge, and defendants' counsel excepted, and the witness in answer to said question, testified that he thought a culvert in the embankment at the ravine, and a stone bridge over Mill creek would have protected the plaintiff's buildings from the flood in 1832. Witness thinks a stone bridge alone over

6

Mill creek would have protected plaintiff's buildings against that flood, because he thinks the bank at the ravine would have worked away as it nearly did. The flood wore away considerable of the embankment near the ravine. There were no buildings in the range of the ravine west of the rail road. Thinks the water did not come up to the plank of the bridge. Witness was not present when the bridge went away; thinks it went off between ten and twelve at night. Witness was there about midnight and the bridge was gone. Has been acquainted with the floods of the Mohawk; has known ice dams to form at the head of the islands previous to 1832, and the water being forced through two culverts under the canal about two miles west of the city, and then came down on the south side of the canal, and run through the culvert at Mill creek with such force as to spout up on the north side of the canal. Before the rail road was built the water would run down Mill creek, unless there was so much as to overflow its banks, and then a portion of the water that flowed over the banks of the creek would run down the ravine. Witness don't know that plaintiff's buildings were ever injured by water before; but about three years before 1832 the spring freshet broke in the walls of witness's buildings, which stood below plaintiff's, and injured the buildings. The fences on the flats were sometimes carried off with these freshets. Ice dams sometimes form at the Mohawk bridge; know of its doing so several times; frequently before 1832. In such case the water of the Mohawk is set back so as to run through the upper culverts under the canal, and come down on the south side of the canal. A dam at the Mohawk bridge would also set the water back up Mill creek. Has known the water in such case to rise seven or eight feet and go down again in two or three hours. This was four years before 1832. Has seen the water move up Mill creek with a rapid current. The ravine extended all the way to the river. Witness thinks it was four feet lower than the plaintiff's buildings, and two or three feet lower than the adjacent ground. Plaintiff's buildings were elevated above the ground eight feet or more. Recollects no instance but the one he has mentioned of the water rising rapidly; at that time witness had crossed at Rotterdam street, and could not get back, and

had to go to the city on the bank of the canal; witness thinks the water run in the canal; at this time it was not full; the water was on the flats on the south side of the canal at that time, but not near so high as in 1832.

The witness was then further interrogated as to the value of the plaintiff's buildings, which were carried off by the flood of 1832; but no portion of the testimony in relation to the value of the property destroyed or injured is set out, as no question arises in relation to the amount of damages.

On being cross-examined, the witness further testified that he does not know the size or dimensions of the Mill creek culvert under the canal; the opening of the rail road bridge for the passage of Mill creek, was twenty-four feet wide, and the posts were eight or nine feet high. Mill creek was walled up on each side; it was eight or ten feet wide, and the bottom of the creek was eight or ten feet below the surface of the ground where the mud sills of the bridge were placed. The creek passed through the centre of the opening or stretch of the bridge; the opening of the bridge extended an equal distance each side of the creek. Witness don't recollect the size of the mud sills; thinks they may be eight by twelve inches; there were two mud sills each side of the creek twelve feet apart; six posts were framed into each sill and four plates framed on the tops of the posts, each plate being supported by six posts; braces run from near the foot or bottom of the posts into the floor timbers or string pieces above; thinks there were no braces from the sills into the posts. There was an embankment from Water street to Mill creek for the road; the rail road was on a level with Water street; the slope at the end of the embankment, each side of Mill creek, formed an angle of about 45 degrees; the embankment covered the outside sills of the bridge, and came on to the sills that lay next to the creek, and came clear up to the top of the outside plates. The opening or water way of the bridge at Mill creek was sufficient to pass off all the water that could pass through the Mill creek culvert under the canal; the opening at the bridge was larger than the culvert; the opening of the bridge was large enough to let all the water pass back that would set up through it. Witness thinks Mr. John I. DeGroff employed him to build the bridge on

Brown *agt.* The Mohawk and Hudson Rail Road Company.

behalf of the company; when witness built the bridge, he did not know of any thing to be guarded against except the water that might set back from the river up Mill creek, and the water that might come through the Mill creek culvert under the canal. Witness was at the bridge the night it went, about 9 o'clock; the water was then above the stone banks of the creek at the bridge, and was running down towards the river; the water was not then running over the canal, it came through the Mill creek culvert under the canal. Witness was back again to the bridge between 12 and 1 o'clock; bridge was then gone. Witness helped rebuild this bridge; it has stood ever since it was rebuilt; the mud sills were not carried away with the flood; they remained where they had been placed when the bridge was built. The flood did not take off any fences on the flats, at the time it rose seven or eight feet on the flats and fell again in a few hours, mentioned in witness's direct examination; at the time of the flood of 1832, the water could not have set back up Mill creek. Before the rail road was built there were small buildings standing over Mill creek, such as privies; never knew any of them carried off by any flood that occurred before 1832. The building of plaintiff which stood next to the bridge, stood over Mill creek; this building at first stood on the south bank of the creek; after the bridge was built, and before the flood, the plaintiff built an addition to that building, extending it across the creek, so that the creek ran under it; the embankment and bridge was all built in the fall of 1831 and winter of 1832; the wooden bridge could not stand the press of water which came through the canal culvert; the rapidity of the current would take the bridge with it. The ravine that witness has spoken of, runs across Rotterdam st. before it enters the Binnie kill; some of the plaintiff's buildings were not over a foot from the surface of the ground; the bridge was rebuilt immediately after it was carried off, with some timber that was in the first bridge. Witness has not lived at Schenectady for the last six years. Witness helped build the Church street bridge; there was only one mud sill and one tier of posts, each side of the creek, in that bridge; the ends were planked up for the embankment to rest against; there are two culverts across Mill creek, at Washington and Water streets; don't know the

Brown *agt.* The Mohawk and Hudson Rail Road Company.

size of those culverts; they are greatly less than the span or opening of this bridge. The building of plaintiff that stood next to the bridge was a barn, formerly; it had been moved to make way for the track of the rail road, and fitted up as a curry shop; the greatest part of this building stood on the south side of the creek; the wing or addition that was built, extended over to the other side of the creek; the floor of that building was not two feet above the surface of the ground; all the rest of plaintiff's buildings were below this one. The next morning after the bridge was taken off, witness saw a large canal boat lodged in one of plaintiff's buildings. When witness was at the bridge at 9 o'clock the night before, the water was rushing under the bridge and against the wing of the building that run across the creek. The building that he saw the canal boat in, the next morning, was a store on Water street on the north side of the creek. There were great quantities of ice thrown over the canal by this flood. Witness thinks this ice must have been made in the river; some might have been made on the flats south of the canal. The swale or ravine spoken of crosses Rotterdam street over the Fuller lot. The plaintiff rebuilt his buildings on the site of those that were carried off, and as much exposed to floods as the first ones were.

On being reexamined, the witness further testified that the barn that was turned into a currier shop, stood flat on the ground, but it was raised up a little when it was repaired, after the bridge was built. One of the buildings that was put up by plaintiff after the flood, was built of brick; thinks some of the buildings that were built afterwards had stone foundations; they were all burned down in 1835. Some of plaintiff's buildings stood where they had stood for years, others had been moved from the track of the rail road. After the water passed the rail road bridge, it took a course toward the ravine, south of plaintiff's buildings; witness found the wrecks of the bridge, witness's shed, and one of plaintiff's buildings in that direction, on Abram Switz's lots, on the corner of witness's and plaintiff's lots. Witness thinks if the embankment had not been made at all, the water would have run off by the ravine. Before the rail road embankment was made the greatest flood was along the ravine, and passed off south of Brown's buildings. The embankment

caused the water to flow off in the direction of Brown's buildings; there was no other place of escape for it. The second bridge was strengthened by having boards put up against the posts to secure the embankment. The boards were placed against the inner posts and the bank came against them; wing boards were also run out to prevent the bank from being washed away.

*Joseph Gillespie*, testified on the part of the plaintiff, that he was in plaintiff's employment in 1832, and was present when the rail road bridge went off; it went off between twelve and two o'clock at night; the water was on the top of the bridge when it went off; when the bridge went off it struck plaintiff's buildings, and took them with it. The building immediately below the bridge extended across Mill creek, and was eight or ten feet from the west side of the floor of the bridge; plaintiff had a tan yard on the bank of the creek below the bridge; there were hides in the vats; these vats were under the building next below the bridge; that building was formerly a barn; it was moved from where the track of the road now is, and placed over the the vats in the tan yard; this building was underpinned with stone, so as to level it; it was raised a little from the ground, and witness thinks a little higher than it was before it was moved; another building was also moved and joined to this, and underpinned like this, and those two, with an addition that was built to them, were fitted up and used as a tan house and currying shop. These two buildings, before the addition was built, did not extend across the creek; they were on the south side of the creek, the side towards the canal; the plaintiff erected an addition to this building, which extended across the creek; this addition consisted of two or three bents, and was placed on a stone foundation. The part of the building formed by his addition was used as a currying shop, and the old part of the building which was over the vats was used as a tan house; the foundation of the addition that was built, was on a level with the old building to which it was added; the buildings stood higher after they were moved; all the buildings went off together; none of them moved before the bridge struck them. Witness thinks the bridge would have struck the buildings if the addition, extending the tan house and currying shop across Mill creek had not been built. Plaintiff had buildings

over the creek before the rail road was made; don't know that they ever received any injury by flood before 1832; the buildings that stood over the creek before 1832, were a bark-house and beam-house; one of these buildings was standing over the creek when witness came to live with plaintiff in 1821 or 1822; the other was built in 1828, or about that time. The water raised higher after the bridge went off, than it was at the time it went off; witness thinks as much as two feet higher. The new buildings that plaintiff erected after the flood of 1832, near Mill creek, were placed on stone foundations, laid in mortar, as high as the surface of the rail road embankment; if his memory serves him rightly some of the new buildings extended across the creek, and were placed on same foundations. Witness has seen high water before 1832; it set back up Mill creek and spread over the flats, when it got so high as to overflow the banks of the creek. When the ice gave way at the Mohawk bridge, the water would fall. The strongest current of water that witness observed was at the ravine; none of the buildings of plaintiff were then in danger. Witness has no recollection of the river damming at the islands before 1832; has known the water run from the south side of the canal through Mill creek culvert, but witness supposed it was water that had set back through the culverts above. Witness has seen the water run back up the creek with great rapidity; has known it rise three feet on the flats in an hour; it set up with a strong current.

This witness then further testified in relation to the property injured and the damage done thereto, which is omitted for the reason before stated.

Upon his cross-examination, the witness further testified that the floor or bottom of the tan house and curry shop, the building next the bridge, was about a foot from the surface of the ground; the underpinning was loose stone, a dry wall; the building next below this and adjoining it, was occupied as a barn. Witness stood in Water st. on the track of the rail road when the bridge went off; the water was over the floor of the bridge; witness does not recollect whether there was any current running over the bridge; the water was 3 or 4 inches higher than the top of the bridge; the top of the bridge was as high as any part of the rail road;

the water was on the top of the rail road at other places; there was some water on Water street where witness stood; Water st. is eight or ten feet higher than the bottom of plaintiff's buildings; standing on Water street where witness did, he could see both sides of the rail road embankment; should not think the water was quite as high on the west or lower side as on the other side; witness thinks there was about a foot difference; witness could see the water on each side of the embankment clear to the canal; Mill creek was running down towards the river then; the water was four or five inches high on the top of the bridge, and was very near as high on the lower as on the upper side of the bridge; some part of this water came through Mill creek culvert under the canal, and some part of it run over the canal. Witness saw one canal boat and one scow come down before day light, after the bridge went away. The canal boat came down before the scow. Ice in large chunks also came down rapidly. Witness came down to the bridge between ten and eleven o'clock at night. When the bridge went off, the end next to Water street, where witness stood, gave way first; that end went down stream and struck with great force the addition or new part of the curry house that had been built across the creek, and which was eight or ten feet below the bridge. When the bridge struck it, the whole building started, and the bridge and building all went down stream together. The bridge would have struck the main building if there had not been a building over. The building on the south side of the creek next below the tan house and curry shop was a barn, and stood ten or fifteen feet back from the bank of the creek, and was about sixty feet below the bridge. The old part of the tan house and curry shop also stood ten or fifteen feet south of the south wall or bank of the creek. Witness don't recollect what building was next to the barn on the south side of the creek; on the north, or Water street side of the creek, the building next below the curry shop was a lime-house, and stood ten or fifteen feet back from the bank of the creek, and was between forty and fifty feet below the bridge; next below the lime-house, on the same side of the creek, was a store, which stood within ten feet of the bank of the creek; part of that went off; the building next below the

Brown *agt.* The Mohawk and Hudson Rail Road Company.

store was a dwelling house; it was not carried off. Witness don't recollect whether the ice came down before the bridge gave way or not. Witness recollects of seeing the water whirling on the upper side of the bridge, but not below. The curry shop which extended across the stream was boarded up, so that the water would have to run under it, to pass below it; this building was forty or fifty feet wide up and down the stream, and was of the same width clear across the creek; the second story of this building is the curry shop; the lower story is the tan house or tan yard; it covers the tan vats and a beam house; the vats were on the south side of the creek, and the beams where the beaming was done, on the other side. Witness was in the curry shop in the fore part of the evening, left it about 9 o'clock and went home, then came down to the bridge between 10 and 11 as before stated; when witness left, the water was not very high, but was rising; when he came back, between 10 and 11, it was so high he could not get into the curry shop, and was running pretty rapidly down towards the river. Witness went up the rail road to the canal; witness's impression is that the water was running over the canal a little, near the rail road; did not go up the canal to Mill creek. When witness came back to the rail road bridge, the water was near up to the plank of the bridge. When going along the rail road to the canal, witness recollects of seeing the water on each side of the rail road embankment. Witness judged it was as high into a foot on the west or lower side as on the other side. Witness went a short distance along the canal; can't say how far; thinks he saw the water running over the canal near the culvert. The whole country south of the canal was then filled with water. The water was near the planks of the bridge when it first began to run over the canal. It had come through the canal culvert and had backed up Mill creek. The next morning witness saw three places where the water from the south side of the canal had run over and broken the canal away; one near the city, another near Mill creek culvert, and one near Rotterdam bridge.

Witness returned from the canal back across the rail road bridge and staid there till the bridge went off; was there when the water rose over the top of the plank on the bridge. Witness

does not recollect of seeing the canal boat come down before the bridge went off; thinks the canal boat came down after the bridge went off.

On being reexamined, the witness further testified that two of the plaintiff's buildings covered the creek before the rail road was made; one where the track of the rail road now is; sills were laid on the wall of the creek, and the floor of the buildings on those sills; one of those two buildings was a wood house; don't know whether this wood house has been moved since the rail road was made. There was a road between the barn and tan house; there were other buildings below the barn; the wood house was a wood shed standing over the creek, underpinned with loose wall so as to make it level, if he recollects right. The witness then testified to the correctness of a map produced on the part of the plaintiff, a copy of which is hereto annexed.

*John Kelly* testified on the part of the plaintiff, that he is a carpenter; saw the bridge when it went off. The end next to Water street slewed round down stream and struck the curry shop and it started; all the building did not go off at the same time. The currying shop went off; the bridge broke off a part of the building and caused it to crush down; the water rose higher after the bridge went away than it was when it went off; the current run strong both before and after the bridge went off. Witness never examined the bridge; has heard the description which the witness Elder gave of it. Witness has observed the current of the water on the flats.

The plaintiff's counsel then put the following question to the witness: *Was that bridge sufficient, in your opinion, to withstand the floods which you have seen on those flats prior to* 1832?

This question was objected to by defendants' counsel, as illegal and improper, but the objection was overruled by his honor the judge. To which decision and ruling the defendant's counsel excepted.

The witness in answer to said question testified, that in his opinion the bridge was not sufficient to withstand the water that might set up from the river, and what might come through the canal culvert.

Witness has known of ice dams forming at the head of the

Brown *agt.* The Mohawk and Hudson Rail Road Company.

islands prior to 1832; has some recollection of the water coming down the canal three or four years prior to 1832; thinks the canal at that time was nearly filled, almost to overflowing; in case of floods the water passes through the canal culverts above the city and fills the flats on the south of the canal as high as the water on the north side.

The plaintiff's counsel put the following question to the witness: *In your opinion, how should the rail road embankment have been constructed, so as to have protected the plaintiff's buildings?*

This question was objected to by defendant's counsel as illegal and improper; but the objection was overruled by the judge, and the defendants' counsel excepted, and thereupon the witness answered—

That in his opinion a stone culvert over Mill creek would have protected the plaintiff's building. It is witness's opinion if there had been a stone culvert there in 1832, the embankment would have broken further up towards the canal. Witness thought so at the time, but very little of the bank had worn when witness saw it. If an opening had been made through the bank, it would probably have saved the buildings.

On being cross-examined, the witness further testified, that he had built several bridges across creeks; two before 1832; that that part of the Mohawk and Hudson rail road which is between the canal and inclined plane was finished a year or two before 1832; the embankment of that part of the road which runs from the foot of the inclined plane across the flats south of the canal to the canal, is as high as the tow path of the canal. That part of the road for which the embankment in question was made, was for the Schenectady and Saratoga road. The embankment of the road south of the canal stopped the water, but was torn away. Witness don't know the size of the Mill creek culvert; nor does he know the size of the opening or water way of the bridge in question. If the opening of the bridge was large enough to pass all the water that could come through Mill creek culvert and the water that might set back up Mill creek, there could be no difficulty in its standing; knows of nothing to be guarded against in building the bridge but the back water and

the water that would come through the culvert; if the span or opening of this bridge was large enough to pass that water, it would be sufficient: witness does not know the size of the opening or span of Church street bridge across Mill creek. The flood of 1832 tore away the rail road embankment between the foot of the inclined plane and the canal. Ice of the Mohawk river was carried over to the south side of the canal and driven down on to the flats there. When the end of the bridge struck the curry shop it seemed to crush down; the water had just commenced running over the top of the bridge, and there seemed to be a pressure of water under the bridge which raised it up. It was the end of the curry shop next to Water street that crushed down when the bridge struck it. The bridge then passed off below the curry house and lodged among the other buildings of the plaintiff. The part of the curry shop and tan house that was on the south side of the creek, was standing after the bridge had gone off down stream, and remained standing there till witness went away. The bridge did not strike any other building. When witness returned the next morning all of the tan house and curry shop was gone, as witness thinks. Church street embankment is a solid embankment, running parallel with the rail road, and higher than the rail road. Mill creek is not a rapid stream, it is supplied wholly by springs and is not subject to rises except when the water sets up from the Mohawk, in consequence of the ice dam forming at the Mohawk bridge.

*John H. Moyston* testified on the part of the plaintiff, that he had lived in Schenectady seventy-one years; once owned the property where plaintiff's buildings stood; is acquainted with the character of the freshets of the Mohawk; saw a part of the flood of 1832; he came down to Mill creek below the rail road bridge about noon of the day it went off; saw a canal boat driven into his son's store, that stands on Mill creek, below plaintiff's buildings that were carried off; the store occupied by his son was not carried off; has seen the water higher than it was at this freshet; don't recollect the time; thinks it was thirty years ago; at that time there was nothing to be seen on the flat but one of Daniel Campbell's gate posts. Since the Mohawk bridge has been built the ice generally lodges against it when the river breaks up,

Brown *agt.* The Mohawk and Hudson Rail Road Company.

sometimes so compactly as to obstruct the channel of the river. Has known ice dams to be formed at the head of the islands before 1832; at the head of Van Slyck's island; at a place called Knock-'em-stiff, two miles above the city. Has known the water of the Mohawk river to run down the canal about four years before 1832; it was produced by an ice dam at head of the islands; it then nearly filled the canal and broke out on the east side and run over the canal bank near Doctor Mynders's store. The ravine is two hundred and fifty paces from Mill creek, that takes the water that comes from Judge Veeder's; the water follows this ravine or low ground till it gets to where Brown's orchard was, a little south of his buildings; it then turned and run into Mill creek.

On his cross-examination the witness further testified, that this great flood which he mentioned was in the fall of the year, when there was no ice; never knew such a flood before or since. The swale or low ground which witness means, run to Brown's orchard, then into Vrooman's road, then into Mill creek. Rotterdam street, and Washington street are both higher than Vrooman's road and Water-street. Mill creek is the lowest point on the flats. Witness never knew the ice and flood come down behind the canal as it did in 1832, either before or since; never saw such a flood as that before, except the great flood which he mentioned in the fall.

Plaintiff's counsel then read in evidence, by consent of defendant's counsel, from a copy of the bill of exceptions, taken on a former trial of this cause, as follows, to wit:

" *Abraham Van Ingen,* a witness for the plaintiff being sworn, testified that he is a native of the city of Schenectady; saw the flood in 1832; has seen the water east of defendants' rail road higher than it was then, once in 1814; witness then lived in Washington street; has also seen the water higher previous to 1814; once previous to 1789, when it was as high as Wendell's gate in Mill lane, which was several feet higher than it was in 1832. Since the building of the Mohawk bridge, the ice frequently dams up there, and throws the water back on the flats, and when the ice gives way a strong current is produced; before 1832, the river dammed up to the heads of the islands and the

water ran into the canal as it did in 1832, but did not break over the banks. The ravine spoken of by the witnesses was the natural channel in floods for the water to take in passing off.

" *Cross-examined :* Does not know the width of the bridge; does not know of any other water to be provided for, to pass through the bridge than the back water, and that passing through the culvert under the canal; never saw any other before 1832."

The act incorporating the defendants, passed April 17th, 1826, was introduced in evidence, and may be referred to by either party.

A map was also introduced by the defendants, which was proved to be an accurate representation of the plaintiff's premises and the contiguous grounds, and which shows the course and operation of the flood referred to, and the places at which it broke over the banks of the canal, which map may be used by either party, and which is hereto annexed, marked B.

The plaintiff's counsel here rested his cause.

Whereupon the defendants' counsel moved for a non suit, and urged, among other things, in support of said motion:

*First.* That the gravamen of each of the counts in the declaration was, that the defendants in constructing their said embankment and bridge, had not made them sufficient to pass off the water and ice accustomed to accumulate in Mill creek, and that the evidence clearly showed not only that the bridge was abundantly sufficient for that purpose, but that the injury complained of was occasioned not by any accumulation of the waters or ice of Mill creek, but from the waters of the Mohawk from extraordinary natural causes which could not have been foreseen or prevented, being thrown over to the south side of the canal, and thus rushing down on the south side of the canal, and over its banks at and near the place where Mill creek passed under it, and thence down to the defendants' bridge and plaintiff's buildings, sweeping every thing away in its course.

But his honor the circuit judge held that the third count was broad enough to cover any injury occasioned by any water or ice, whether it was such as was accustomed to accumulate in Mill

creek, or whether it accumulated or came from any other source, and refused to non suit the plaintiff on that ground.

To which decision the counsel for the defendants excepted.

*Second.* The defendants' counsel contended that the proof not only wholly failed to sustain the declaration, but that from the evidence it clearly appeared that the loss and injury which the plaintiff had sustained, had not accrued from any cause against which the defendants were bound to guard in the construction of their road, but from an unusual and extraordinary natural cause which no human sagacity could foresee or prevent.

But his honor the circuit judge refused to non suit the plaintiff upon said last mentioned ground.

To which decision the defendants' counsel excepted.

*Third.* The defendants' counsel insisted that the erection by the plaintiff of the building for his tan house and curry shop, immediately below the bridge and close to it across the said Mill creek, thus filling up the water way of the bridge, so that very little or no water could pass through it, except what could pass in the channel of said creek under said building, was the occasion of the injury he had sustained; at the least it was such a gross act of carelessness and want of common prudence on his part (if it be assumed that such a flood should have been anticipated and guarded against by the defendants), as deprived him in law of all right to recover of the defendants, for an injury arising as much from his own want of care and prudence, as from the want of any care or skill on the part of the defendants in the construction of their road.

But his honor the circuit judge refused to non suit the plaintiff upon all or any or either of said grounds, or any other ground.

To which decision the counsel for the defendants did then and there except.

*John I. De Graff* was then sworn as a witness on the part of the defendants, and testified that he was one of the directors of the defendants in 1831 and 1832; that he made the contract for the defendants with the plaintiff, for the land upon which the section of the rail road in question was constructed; the contract was made some time between the months of November 1831 and January 1832, and before any part of the road or embankment

was constructed.   The plaintiff, after the road was constructed, gave the defendants a deed in pursuance of said contract.   The deed now shown to witness, dated 29th September 1832, with the map therein referred to thereto attached, is the deed that was given in pursuance of said contract; that said map was attached to the deed when the same was executed, which said deed is in the words and figures following, to wit:

" This indenture, made the 29th day of September, in the year of our Lord one thousand eight hundred and thirty-two, between John Brown of the city of Schenectady, and Rebecca his wife, of the first part, and the Mohawk and Hudson Rail Road Company of the second part witnesseth, That the said party of the first part, for and in consideration of the sum of twelve hundred and fifty dollars to them in hand paid, by the said party of the second part, the receipt whereof is hereby confessed and acknowledged; have granted, bargained, sold, remised, released, aliened and confirmed, and by these presents do grant, bargain, sell, remise, release, alien and confirm, unto the said party of the second part, and to their successors and assigns, forever, all that certain piece and parcel of land situate in the second ward of the city of Schenectady, extending from Water street in said city across the Mill creek, and to the Erie canal, being the piece of land taken by the parties of the second part for their rail road, and the accommodations thereto appertaining and belonging, and known as lot No. 19 in the map of the said company, and particularly laid down in the map hereto annexed, and containing fifty-four thousand three hundred and seventy-three square feet, excepting and reserving out of said number of square feet so much of the surface of said Mill creek as is embraced in said map attached hereto, the surface and right of passage of said creek as the water runs, belonged to Archibald Craig and John Strong, and subject however to this restriction, that neither the parties of the second part, their successors or assigns shall erect in the said road, in front of the remaining ground of the said John Brown, adjoining said road, any fence or building which may obstruct the view from any buildings which the said party of the first part, his heirs or assigns, may erect on said remaining ground, except such fence as is required by the act incorporating

Brown *agt.* The Mohawk and Hudson Rail Road Company.

the parties of the second part, and excepting such buildings as are required for carrying on or facilitating the business of the parties of the second part, together with all and singular the hereditaments and appurtenances thereunto belonging, or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and all the estate, right, title, interest, claim and demand whatsoever of the said parties of the first part, either in law or equity, of, in and to the above bargained premises with the said hereditaments and appurtenances. To have and to hold the said above granted and described piece of land excepting and reserving as aforesaid, and subject as aforesaid, to the said party of the second part, their successors and assigns to the sole and only use, benefit and behoof of the said party of the second part, their successors and assigns for ever. And the said parties of the first part, for themselves, their heirs, executors and administrators, do covenant, grant, bargain, promise and agree to and with the said party of the second part, their successors, and assigns, that they, the said parties of the first part, their heirs, executors and administrators, the above bargained premises in the quiet and peaceable possession of the said party of the second part, their successors and assigns, will warrant, and by these presents for ever defend, against all and every person or persons lawfully claiming or to claim the whole or any part thereof.

" In witness whereof, the said parties of the first part have hereunto set their hands and seals, the day and year first above written.

[" The word ' successors,' interlined once in the first page, and four times in the second page, over the word ' heirs' first cancelled, with a pen, before execution.]

" John Brown.            [L. s.]
               her
" Rebecca  +  Brown.    [L. s.]
               mark.

" Signed, sealed and delivered in the presence of
        " S. W. Jones.
" John I. De Graff, *witness to Rebecca Brown's signature.*

" *Schenectady County,* *ss:* On the fifth day of October, in the year 1832, before me, Samuel W. Jones, a judge of the

7

County Courts, in and for the county of Schenectady, personally appeared John Brown, to me known to be the grantor in the foregoing deed described, and he acknowledged that he executed said deed for the uses and purposes therein mentioned, and the material alterations appearing on said deed being noted before such acknowledgment, let the same be recorded.

" S. W. JONES.

" *State of New York, Schenectady County, ss :* On the 18th December 1832, personally appeared before me, Rebecca Brown, the wife of John Brown, one of the grantors within named, who to me is personally known, and who was by me examined separately and apart from her husband, and acknowledged that she had executed the within as her act and deed, of her own will and accord, and without any fear or compulsion from her husband, for the uses and purposes therein mentioned. I do allow the same to be recorded. Dated Schenectady, 18th December 1832.                                    JOHN I. DE GRAFF,

*Mayor of the city of Schenectady.*

" *State of New York, Schenectady County Clerk's Office, ss :*
    " Recorded December 4th, 1832, at 11 o'clock, A. M., in Book I. of Deeds, pages 590, 591, &c. .

" JOHN S. VROOMAN, *Clerk.*"

A copy of the map referred to in, and attached to said deed, is hereto annexed, marked C.

The witness further testified that the engineers of the defendants had located this section of the road, and surveyed and made an accurate description of the land that would be required to construct it, before the contract for the purchase of said land was made with plaintiff, and that said contract was made with reference to said location, survey and description. Plaintiff was very anxious to have the road located where it was. There was no agreement or understanding with plaintiff that defendants should build either a culvert or stone bridge across Mill creek. After the contract was made and while the road was constructing, witness had a conversation with plaintiff about the bridge across Mill creek; he wanted a stone bridge so that he might use the parapet wall as a part of a foundation for a building; he said it would save him the expense of building one wall; but he never

Brown *agt.* The Mohawk and Hudson Rail Road Company.

pretended that he wanted a stone bridge for any other reason, or that it was necessary for the safety of his buildings, or that the defendants had agreed to build a stone bridge.

Witness has lived in Schenectady for sixty years; there is no such ravine or swale running through those flats as Mr. Elder and the other witnesses have described, nor has there ever been to witness's knowledge; witness owns land through these flats from Rotterdam street to the rail road, and has for a long time; the only ravine there ever was is a small ditch made by a plow, which carries off the drainage from the canal in the spring, and that was made since the canal has been constructed; in the summer that ditch is dry and potatoes are planted in it; witness never knew or heard of any other drain. Witness's land is the lowest part of those flats; the water from the canal runs over witness's land and under Rotterdam street through a small culvert. The ditch made by a furrow of a plow before mentioned, is the only ravine there is. Witness's land is the lowest part of the flats; it is all mowed every summer; there are inequalities of surface, some spots lower than others, but no swale or ravine, but the whole flats are either mowed or planted with corn and potatoes. There may be a swale or ravine up towards the Mill creek culvert.

The character of the floods or high water on those flats previous to 1832, was water that was set back from the river up Mill creek, and in that way rose till it overflowed the flats, and then receded as the river fell. The water would generally continue rising from twelve to forty-eight hours, and be about the same length of time receding; sometimes it would rise and fall in a shorter period; the current, when the water was either rising or falling, was seldom of sufficient force to carry off fences; a post and board fence was seldom ever disturbed by these freshets, unless the boards were loose; there are more or less fences disturbed by the floods every year; it depends upon where they are located; if on the bank of the river, they are more exposed; they are in danger from the ice of the river; people frequently take up their fences near the river in the fall.

There are two culverts under the canal west of Mill creek; the first of which is half a mile west of Mill creek, and the other

a mile west of Mill creek. Witness was so situated that he particularly noticed the flood of 1832. Witness was on the bank of the canal from a quarter before ten until after eleven o'clock, the night of the flood; at a quarter before ten the water was running over the north bank of the canal on to the flats below, a few feet east of the rail road embankment. Witness went through that water and went down the canal to Mill creek culvert; the water was running over the north bank of the canal at that place, into Mill creek, in greater quantity; at this time the Mohawk river was not full; the water was not up to the top of its banks at the Mohawk bridge, nor was there any water on the flats between the canal and the river; the water that was running over the banks of the canal at this time, came out of the canal, but in less than an hour from that time, water and ice in great quantities rushed down the south side of the canal, and passed over both banks of the canal near the Mill creek culvert and near the city, and close to the rail road embankment, on to the flats on the north side of the canal; the water came so suddenly that lives were lost; two children of Mr. Gough were drowned at Vrooman's house, and Gough and wife barely escaped. When the flood subsided large cakes of ice were piled on the flats west of the rail road embankment, south of the canal; where the water broke over the canal nearest to the rail road embankment, it delved out the earth more than twenty feet. The water which rushed over the canal run down Mill creek with great rapidity. Witness was Mayor of the city of Schenectady at that time, and was apprehensive that the lower part of the city on Water and Rotterdam streets would be entirely swept off; he ordered the alarm bells of the city to be rung. The current was so rapid below plaintiff's buildings, at Water and Washington streets, that they could hardly be crossed in a boat to rescue the families on the other side; finally a boat was got across. The rail road embankment between the south bank of the canal and the foot of the inclined plane, greatly retarded the water and ice which was rushing down the flats on the south side of the canal; had it not been for that embankment the ice and water would have swept off the whole property of Rotterdam street. Plaintiff's property was as much exposed as any of the property on Rotter-

dam street. There has been no flood nor freshet like that before; heard there was one like it in 1839.

The waters of the Mohawk river were thrown on to the south side of the canal in this way—in January there was a thaw, and the river broke up and then froze again suddenly, while the ice was floating in large cakes down the river—the ice was thus stopped at the Mohawk bridge, but did not form a dam there; the dam was formed one and a half miles above the city, at the head of the islands, in the river at that place. There was a sudden thaw and great rise of water in March, which broke up the Schoharie creek and the whole force of the ice and water of that creek and of the Mohawk river was thrown by this dam clear over the canal on to the flats on the south side of it, a mile and an half west of the city, and it came down those flats almost in a body, and rushed over the canal again on to the flats on the north side of it, between the rail road and the city. The water in the river at the Mohawk bridge, and in the Binnie kill, fell greatly, and remained low till the water which came down the south side of the canal was discharged into the Binnie kill and river through Mill creek, and from the adjoining flats. The water which was thus discharged into the Binnie kill carried away the ice at the Mohawk bridge. The ice dam at the islands stopped so much of the river that it was quite low at the bridge, and quite a fall below the bridge, until the river regained its usual quantity of water, from the water that thus came down the south side of the canal and run over it into Mill creek and on to the flats on the north side of it, and discharged into the Binnie kill.

On being cross-examined, the witness further testified that the Mohawk bridge was built in 1808; witness does not recollect when it was erected with its present number of piers; the formation of ice dams at the bridge in a thaw is a common occurrence. It is an uncommon occurrence for the river to break up or ice dams to form in January; it has happened several times in witness's recollection; it does not happen oftener than once in five or six years. Schoharie creek empties into the Mohawk twenty miles above the city of Schenectady. That stream breaks up in the winter more frequently than the Mohawk; that stream rises in the Catskill mountains and is a rapid, powerful stream;

brings down large masses of ice when it breaks up. Has known ice dams form at the head of the islands, without any dam being formed at the bridge; that has been occasioned more from the ice of Schoharie creek, than from the ice of the Mohawk; sometimes such dam is formed so far above the islands that it does not affect the flats in the neighborhood of the canal; when the dam is formed at the head of the islands, the water generally rises so as to run through the culverts under the canal, and overflow the flats on the south side of the canal, then it would run down and pass the Mill creek culvert, which is lower than those above (except in the spring of 1832); a portion of it, however, might run down to Mill creek culvert; that would be the natural course. Witness was not in the city of Schenectady in 1828; was then a member of congress and spent the winter at Washington; for two winters last past the Mohawk has broken up in January.

Witness was not present when the plaintiff's buildings went off; at day light in the morning the basin was nearly full of water; it was within eighteen inches, witness should think, of the top of the rail road embankment; at twelve o'clock there was nothing like so much water in the basin; the water was not quite so high on the west side of the rail road embankment; there was a rapid current through the waterway of the rail road bridge, and then it continued to the river; a boat which lodged on one of plaintiff's buildings, protected it from the ice. The water continued to run over the canal from the south to the north side until about the middle of the forenoon of the day after the bridge and buildings were carried off. The water was not over three or four feet deep on Rotterdam street at any time when witness was there; that street is higher than the ground on each side of it. After daylight the next morning the water was not over three feet high on Rotterdam street. When high water is made on the flats, by the water being set back by a dam at the bridge, witness has seen it as high as six feet on Rotterdam street. Witness never saw the water so high on the flat above the rail road bridge as it was at this flood. It was occasioned by the immense quantity of water which run over the canal on to the flat. In the morning the water was all of eighteen inches

higher on the south side of the canal than it was on the flats, on the north side of the canal above the rail road bridge; the rail road embankment was made a little higher than the top of the bridge, as it was calculated it would settle a little. The road was not finished at the time of this flood; the rails had not been put on. Witness had stone drawn to make a stone culvert at Mill creek, as plaintiff wished to have it done for the reason before mentioned, and witness wished to gratify him; a few loads of stone was drawn in the fall for that purpose, but that was given up and a wooden bridge built by direction of the engineers.

On being reexamined the witness further testified, that at the time he saw the water six feet deep on Rotterdam street, as stated in his cross-examination, it was occasioned by the water being set back by a dam at the Mohawk bridge; that on that occasion the water rose and receded in the manner related by witness in his direct examination. When plaintiff executed the deed of the land for this road to the defendants, in September after the flood, he made no pretence whatever to any claim against the defendants for damages on account of the loss sustained by this flood; at that time and at the time of the accident, he claimed that the Mohawk bridge company were liable to him for the damages he had sustained.

*William J. McAlpine* testified on the part of the defendants, that he is an engineer, and has for many years been in the employment of the state as such engineer on the Erie canal. The culvert at Mill creek is a semi-circular culvert; twelve feet chord with abutments two feet high; the area of its waterway is eighty 54-100 square feet; the area of the waterway or opening of the bridge across Mill creek as described by the witness Elder, taking the least dimensions mentioned by him, is 336 square feet; the opening or waterway of the bridge is sufficient to pass three times as much water as could come through the Mill creek culvert. Witness is acquainted with and has had much experience in constructing such bridges and culverts. Witness heard the description of the manner in which this bridge was built, as given by Mr. Elder in his testimony, and the fact stated as to how long it withstood the flood of 1832. There can be no

possible doubt that the bridge was amply sufficient in all respects to resist and withstand all the force that could be brought to bear upon it from any water which would set up through its waterway by means of ice dams at the Mohawk bridge, and all the water that could pass under the canal through Mill creek culvert.

*John B. Jarvis* testified on the part of the defendants that he is an engineer; has been in the employment of the state on its various canals for many years, as such engineer. Witness heard Mr. Elder's description of the manner of constructing the defendants' bridge over Mill creek; witness also heard the testimony in relation to its being carried off by the flood of 1832; the waterway of this bridge was much more than sufficient to discharge without obstruction or difficulty, all the water that could be required to pass through it, arising from high water, occasioned by any ice dam at the Mohawk bridge, together with all the water that could pass through Mill creek culvert. The strength of the bridge was amply sufficient to withstand all the force that could be brought to operate upon it from either or both of those sources. Witness is acquainted with the Erie canal and the relative elevation of its culverts; the bottom of the two culverts next above Mill creek culvert, are three feet lower than the bottom of Mill creek culvert. The two upper culverts just mentioned, afford the first outlet for any water that may be on the south side of the canal, when the river falls. Witness was the engineer who had charge of the section of the defendant's road between the canal and Water street; the bridge in question was planned by witness; witness made sufficient provision for all the water that could be required to pass the bridge, either from the water being set up Mill creek, and on to the flats by ice dams, or from any water which could come through Mill creek culvert, or from both of those sources. Witness then believed and still believes the bridge was amply sufficient.

On being cross-examined the witness further testified that the flats adjacent to the first lock, on the canal west of the city of Schenectady, are higher than those near the city, six or eight feet perhaps. There is but a very slight current in the Mohawk river from the head of the islands down to the Mohawk bridge;

Brown *agt.* The Mohawk and Hudson Rail Road Company.

at the head of the islands there is a reef, where there may be a fall of one or two feet perhaps. Witness thinks he contemplated at one time to build a stone culvert for this section of the rail road over Mill creek. The water will be forced through Mill creek culvert with great velocity, if there is a large head of water on the south side of the canal.

*Isaac W. Crane* testified on the part of the defendants, that he resides in the city of Schenectady; is an engineer, and was the resident engineer of the defendants, having the personal charge of the construction of the section of the defendants' road between the canal and the Mohawk river; the bridge across Mill creek was constructed under witness's superintendence as engineer. The waterway of the bridge was amply sufficient to pass without obstruction all the water that could be set back from the river by ice, and all that could pass through Mill creek culvert under the canal, and amply sufficient to resist all the force that could be brought to bear upon it from both those sources combined. The foundation of Mill creek culvert is nearly the same height as the bed of the creek under the rail road bridge.

On being cross-examined the witness further testified, that witness first contemplated building a culvert over Mill creek, and twenty or thirty yards of stone were drawn for that purpose. Plaintiff complained or was dissatisfied that the bridge was not built of stone. Saw plaintiff's buildings before they were moved to make room for the rail road. The plaintiff had buildings standing across the stream before the railroad was made. There is a descent in Mill creek; Doctor Craig had a mill on Mill creek below the canal; witness understood that Mill had three feet fall; that mill was twenty or thirty rods above plaintiff's buildings; there is some but not much descent from that mill to plaintiff's land; a descent of one or two feet perhaps; there is a mill now where plaintiff's buildings were; it is built across the creek; witness does not know what head of water that mill has.

On being re-examined he further testified, that Doctor Craig's mill stood at the foot of the pond designated on the map given in evidence, and was supplied from that pond; the sides of the pond and of Mill creek are raised all the way to the canal, and built up with stone for the purpose of retaining the water for the use

of the mill.   Witness rebuilt the rail road bridge after this flood, it was built with the timbers of the first bridge, with the exception of a small portion which could not be found; it was built on the same sills, which had not been disturbed by the flood; there was no difference between the strength of the first and second bridge; the second bridge has withstood every flood that has occurred since 1832.

On being again cross-examined, the witness further testified, that the angles of the second bridge might have been filled different from the first.

*Jonathan Crane* testified on the part of the defendants, that he resided in the city of Schenectady from 1814 until 1833, when he left; returned again to the city in December 1841, and has since resided in said city.   Witness saw the flood of 1832; was up all night, except about an hour.   Witness was on the bank of the canal between the city and railroad, from 7 o'clock in the evening until half past ten.   The water began to rise in the canal between sunset and dark of that day; about 9 o clock the water was very near to the top of the banks of the canal in the canal; witness called upon the collector and urged him to cut away the banks of the canal above Rotterdam street, as the only means of safety to the people and property on the flats.   At 9 o'clock the superintendent of repairs on that section of the canal was sent for; at half past 10, P. M., when I left, the water was then running over the heel path bank of the canal in a thin sheet, for several rods.   I cannot say that it run into the basin, but it run out of the canal over the south side.   Witness left the canal at half past 10, and returned at 12 o'clock at night.   When witness left there was very little water on the north side of the canal where Doctor Craig's mill was; there was very little if any water on the flats at this time.   Witness recollects of being on the flats on his way from the canal home, and of notifying the inhabitants that they would be in danger from the water coming down the canal before morning.   At 12 o'clock, when witness returned, the water was running in large quantities over the north bank of the canal into Mill creek, and on to the flats adjoining the creek.   Before two o'clock, immense quantities of water and large masses of ice came down Mill creek through

Brown *agt.* The Mohawk and Hudson Rail Road Company.

the flats. Witness was not at the canal at this time; was at the lower part of the city. Witness was not at the railroad bridge when it went off. Witness never knew such a flood as this before or since, though he has known the water higher on the flats in the basin formed by the rail road embankment, canal and high ground of the city, but never knew such a quantity of water on the south side of the canal. A year ago last winter the water was higher on the flats and in the basin; it set back then from the Mohawk river; but in the flood of 1832, the water in the Mohawk river was considerably below the top of its banks at the Mohawk bridge, when the water was four feet deep on Rotterdam street.

On being cross-examined the witness further testified, that the Binnie kill was clogged up with ice that had been thrown into it by the flood. For a number of days after plaintiff's buildings had been carried off, according to witness' recollection, the ice dam that formed at the head of the islands four years prior to 1832, did not throw any water into the canal. The formation of ice dams at the Mohawk bridge is a usual occurrence; they occasion a sudden rise of water, and when the dam gives way the water falls rapidly.

*Mr. McAlpine* was again called by the defendants; testified that in 1831 he took a level of the ground upon which the railroad embankment was built from Water street to the canal. The level was taken upon a base line 4 and 64-100 feet above the bottom of the canal; the top of the bank at Mill creek was 8 50-100 feet below that line; the surface of the water in Mill creek where the bridge crossed it was 17 22-100 feet below that line; at three chains seventy-seven links on the line of the embankment from the south embankment towards the canal, the surface of the ground was 11 20-100 below the base line; at four chains fifty-one links from the last point towards the canal on the line of the embankment the surface of the ground was 8 20-100 feet below the base line; at two chains and sixty links from the last point, which brought him to the foot or base of the canal bank where the rail road embankment joined the canal bank, the surface of the ground was 6 55-100 feet below this base line; the surface of the water of Mill creek at the rail road

Brown *agt*. The Mohawk and Hudson Rail Road Company.

bridge is 10 70-100 feet lower than the surface of the ground where the rail road embankment joins the north bank of the canal; at three chains and seventy-seven links from the creek towards the canal, the surface of the ground is 2 22-100 feet lower than the top of the north bank of the creek.

*Cross-examined*: Witness has no knowledge that the north bank of the canal is built up with stone.

Here the defendants' counsel rested their defence.

*Caleb Tompkins* was then called as a witness on the part of the plaintiff and testified, that he saw the defendants' bridge across Mill creek carried off by the flood in 1832. Witness came from the canal on the railroad embankment and crossed the bridge before it went off, and staid there until it went off. There was quite a crowd of people gathered round there. The south end of the bridge went off first; it swung round and struck the first building; they went off together, and all the other buildings went off at the same time. Witness is a carpenter; has lived in Schenectady eight or nine years, and had witnessed the floods of the Mohawk. Saw the workmen building this bridge; *in witness' opinion there should have been a wall to keep the water from washing away the embankment under each end of the bridge. Witness should not think the bridge was sufficient to protect plaintiff's property against ordinary floods.*

The testimony, as to the opinion of the witness, was objected to by defendants' counsel, but the objection was overruled and the testimony admitted by the circuit judge, and the defendants' counsel excepted.

On being cross-examined, the witness further testified that he is now twenty-eight years old; that he began to work at the carpenter's business immediately after the flood of 1832; had never worked at the business before; witness was seventeen years old at the time of the flood, and was then and at the time the bridge was being built an apprentice to the plaintiff, learning the trade of tanner and currier, and worked at that business in plaintiff's tan yard near the bridge; that was the way he saw the men at work building the bridge.

The night of the flood witness went out on the rail road south of the canal, between the canal and inclined plane; that part of

Brown *agt.* The Mohawk and Hudson Rail Road Company.

the rail road embankment gave way at the first culvert through the embankment. While witness was out there the whole flats between the south side of the canal and the hills up which the inclined plane of the rail road ascends, was covered with water; it was the current of the water coming down the flats south of the canal that broke away the rail road embankment which crosses those flats.

*Caleb Pierson* was then called as a witness on the part of the plaintiff, and testified, that he has lived in Schenectady eleven years; is a mill wright; has built several mills; witness put the wheel into Strong's mill on Mill creek below the rail road bridge; the head of water to that mill is eight or nine feet; sometimes it is down to seven feet; the pond when full sets the water back under the canal through Mill creek culvert fifty rods beyond the canal. The distance from the Mill to the canal is thirty five rods. Witness has noticed the character of the floods in the Mohawk; has seen the water set up Mill creek from the rise of the water in the river when there was no ice dam formed at the bridge, as well as when such dams were formed; has sometimes seen the water set up Mill creek so rapid as to make a horizontal current up the creek of eight feet in a second; there was current enough to carry some kind of wheels; has seen it run through the Mill creek culvert both ways fast. Witness believes he understands the structure of this bridge; has built dams and locks, and is acquainted with the structure necessary to resist water. Witness thought this bridge was not sufficient at the time to resist the water that would come against it from the rise of water in the river and through Mill creek culvert, and not sufficient to protect plaintiff's buildings from such water. Witness thinks the bridge should have been built with larger timbers; that the banks each side of the creek should have been spiled and puddled so as to prevent their being washed away. Witness would puddle with clay. Witness thinks something of that kind should have been done. Witness thinks a stone culvert or an arched stone bridge across Mill creek, would have protected plaintiff's buildings; thinks they would have resisted the flood of 1832. Witness also thinks if there had been an opening in

the rail road embankment, towards the canal, the current would have gone that way.

After this witness had given the foregoing testimony, and before he was cross-examined, defendants' counsel stated to his honor the circuit judge, that he supposed that it was considered that all of said testimony of said witness, in regard to his opinion as to the sufficiency of the bridge, and as to the manner in which it should have been built, and as to what structure would have protected plaintiff's buildings, &c., was admitted against the objection of said counsel, and subject to his exception to the decision admitting said testimony. Upon his honor the circuit judge stating that he did not so understand it, the counsel for the defendant moved to strike out all of the testimony of said witness after the sentence ending with the words " *acquainted with the structure necessary to resist water,* " as being illegal and inadmissible in any point of view, and even under the rule established by his honor, the testimony of this witness could not be received, inasmuch as the witness was not a bridge builder or an engineer. But his honor the circuit judge refused to strike out said evidence, and held it legal and pertinent evidence in said cause.

To which decision the counsel for the defendants did then and there except.

Upon his cross-examination the witness further testified that engineering is not his business, but he has practiced it some in taking levels. Witness has constructed several bridges. In constructing the bridge in question, witness should not suppose he would be required to make a structure to withstand any thing except the force of such water as might set up Mill creek from the Mohawk river, and such as might flow through Mill creek culvert. Witness does not know the size of the timbers of this bridge, but he thought at the time they were rather small; has seen the bridge that is standing there now. Has seen the Church street bridge across Mill creek, just above this bridge; it was a wooden bridge, but has never noticed it particularly; neither of those bridges have been carried off since 1832. If the opening or waterway of the rail road bridge was large enough to pass all the water that would

Brown *agt.* The Mohawk and Hudson Rail Road Company.

be required to pass it, it would be sufficient. Witness only expressed his judgment, or guessed at the rate at which the water run up Mill creek when he stated it run eight feet in a second. Witness should not consider a current or stream that run only six miles an hour very rapid. It would require a stream to run ten miles an hour to be what he would consider a rapid stream.

The testimony was here closed on both sides.

And thereupon the counsel for the defendants moved his honor the circuit judge to nonsuit the plaintiff on the several grounds urged on the previous motion for a nonsuit, insisting that it was so manifest from the evidence; that the plaintiff was not entitled to recover; that should the jury give a verdict for the plaintiff the court would be bound to set it aside, as against the evidence in the case. But his honor the circuit judge refused to nonsuit the plaintiff, to which decision the counsel for the defendants excepted.

The counsel for the defendants then insisted upon the following positions, as the law applicable to this case, and which should govern the jury in forming their conclusion as to the liability of the defendants, and so requested his honor the circuit judge to charge the jury, to wit :

*First*—That the only casualties against which the defendants were required to guard by the exercise of ordinary care, prudence and skill in the construction of said bridge, were the flow and reflow of the water up Mill creek and its adjacent flats from the rising of the Mokawk river, together with such water as might come through the Mill creek culvert from any known ordinary source or cause.

*Second*– That if the engineers and agents of the defendants at the time they constructed the bridge, exercised common prudence, care and skill in coming to the conclusion that it was amply sufficient to withstand any force or pressure which might be brought to bear upon it from all of the sources or causes mentioned in the first proposition, then the defendants were not liable.

*Third*—That the defendants had a right, by virtue of their deed from the plaintiff, to build the embankment for that section of their road, without any opening between the canal and the

bridge across Mill creek, and that the fact that no such opening was left or made in said embankment, was no ground of liability for the injury which had occurred.

*Fourth*—If the injury to plaintiff's buildings was not occasioned by water that was set up Mill creek from the rise of the Mohawk river, or by the water that came through Mill creek culvert, or by the water from both of those sources combined, the defendants were not liable.

*Fifth*—That unless the jury should find from the evidence that the bridge would have gone off and carried off the plaintiff's buildings, if he had not erected his building across the stream immediately below and close to the bridge, so as greatly to stop up its opening or water way, the defendants were not liable.

As to the first proposition, his honor the circuit judge charged the law to be as therein insisted by the defendants' counsel.

As to the second proposition his honor stated to the jury that he should charge them that the law was as therein stated.

But the Judge remarked in explaining his views on this point :

That the defendants were bound so to use their own property as not to injure that of others; that in the construction of said rail road and bridge, they were bound to acquire and possess themselves of all the facts necessary to form an accurate judgment as to the requisite strength and structure of the embankment and bridge, as for instance the character of the floods of the Mohawk in former years, and after ascertaining the facts they were bound to exercise such due care and foresight as that their structure should not be the cause of injury to the property of others, so far as ordinary care, skill and foresight could effect that object, and his honor refused otherwise to charge in relation to said second proposition.

To which charge and refusal the counsel for the defendants excepted.

As to the third proposition his honor refused to charge as therein and thereby requested; but charged the jury in relation to said proposition, that he agreed to this proposition provided the jury should think the plaintiff's property below could be adequately protected without such opening or culvert in the embankment; but that if they should be of opinion that common

Brown *agt.* The Mohawk and Hudson Rail Road Company.

prudence and forecast would require a culvert in the railroad embankment between the canal and the bridge over Mill creek, in addition to the bridge, to protect the plaintiff's property from the effects of such floods or high water as might, at the time the bridge was constructed, be. expected to occur, the omission to make such culvert would render the defendants liable.

To which refusal and charge in relation to said third proposition, the counsel for the defendants excepted.

His honor the circuit judge also refused to charge in conformity with the defendants' fourth proposition, but charged the jury in relation thereto that if the said bridge was not sufficient to protect the plaintiff's buildings against the previous floods produced only by water setting up Mill creek and coming through the canal culvert, and if the structure which ordinary care and prudence required to be erected for the protection of plaintiff's buildings against such floods, would have protected these buildings in the flood of 1832, then the plaintiff was entitled to a verdict; that he thus understood the doctrine laid down by the Court for the Correction of Errors in this case, on appeal in the opinion of the chancellor.

His honor also, in regard to the fifth proposition, charged the jury in relation thereto as follows, to wit:

That said fifth proposition was substantially true; but that, although the jury might find that the erecting the plaintiff's buildings across the creek and near the bridge, was the immediate cause of the going off of the bridge, and thus of the plaintiff's buildings also, yet if they also found that the bridge was insufficient within the principles laid down in the charge relating to the first and second of the defendants' propositions, and would have for that reason been swept off by the flood of 1832, and thus carried off the plaintiff's buildings, if there had been no buildings erected across the stream below the bridge, and no such impediment created to prevent the free passage of the water off below the bridge—then the plaintiff would be entitled to recover—and with this exception or modification the fifth proposition was correct.

To which charge in relation to said fifth proposition the counsel for the defendants excepted.

8

Under which charge and instructions his honor submitted the cause to the jury, who found a verdict for $5,807·41 for the plaintiff, with six cents costs.

At the May term, 1845 of the Supreme Court, the case and bill of exceptions, which had been previously argued, was decided, and a new trial *denied.*

The following is the opinion of the Supreme Court.

BRONSON, Ch. J.—A witness must speak to facts; his opinions are not evidence. Such is the general rule. But there are exceptions. On questions of identity, handwriting, value, and, perhaps, some others, where, from the nature of the case, it is impossible to lay all the facts affecting the question before the jury. Any competent witness, having knowledge on the particular subject, may give his opinion. And witnesses skilled in any art, science, trade or business may give their opinions on questions of skill in their particular calling. It cannot, I think, be denied, that the proper place, as to form and materials, for the construction of this bridge, was a question of art, upon which the opinions of experts might be received. But the argument for the defendants is, that the plaintiff did not call that class of witnesses. The argument is well founded, in point of fact, as to most of the witnesses. So far as it appears, Benedict was not an engineer, nor was he a bridge builder, or a mechanic of any kind. The witnesses, Elder, Kelly and Tompkins, were carpenters; but there was nothing in that employment which qualified them to give opinions on the question whether this bridge should have been built of stone instead of wood; nor had they any peculiar knowledge in relation to the necessity of a culvert in the embankment. Hydraulics and engineering are not part of the necessary education of a carpenter. Elder built the bridge; but he only followed a plan which was furnished by the defendants' engineer. It does not appear that bridge building was his calling, or that he had any peculiar knowledge in relation to that business. Pierson was a millwright, who had built several mills; he had also built dams and locks, and was acquainted with the structure necessary to resist water. He must, I think,

Brown *agt.* The Mohawk and Hudson Rail Road Company.

be regarded as possessing the requisite skill to qualify him to give an opinion upon the sufficiency of the bridge. In relation to the four other witnesses, the only ground upon which the ruling of the judge can be supported, is, that the objection taken on the trial, went to the nature of the evidence, and not to the qualification of the witnesses. When opinions were called for, the defendants objected that the evidence was illegal and improper: that undoubtedly turned the attention of the judge to the question whether this was a case for receiving opinions; and not to the enquiry whether a proper foundation had been laid for receiving the evidence from these witnesses.

The specific objection that they were not experts, or men of skill, was not taken; and we can not allow an objection to prevail here which was not made at the proper time.

The engineer who had charge of the construction of the bridge and other works, was the defendants' agent or servant, and proving what the plaintiff said to him at the time about the sufficiency of the bridge, is not open to the objection that it was proving what had passed between the plaintiff and a stranger to the defendants.

The third count of the declaration was clearly broad enough to cover the case which the plaintiff made by his proof; and the objection for alleged variance was properly overruled.

After what has already been settled as the law of this case, by the Court of Errors, it would have been improper to nonsuit the plaintiff on the ground that there was no evidence tending to support the action. There was proof enough to carry the cause to the jury. Whether the plaintiff was chargeable with negligence in the manner of constructing his buildings, and so caused or contributed to the injury of which he complains, was a question of fact for the jury; and the judge was right in not taking it from them by ordering a nonsuit.

The defendants submitted five propositions, on which they requested the judge to charge the jury. In relation to the first and second points, the judge gave the desired instruction. But he added some remarks in relation to the second, which the defendants think objectionable. The remarks were of a general

nature, and I do not see that they are open to any legal exception.

The fact that the defendants had purchased the land for the road-way from the plaintiff, did not authorize them to construct the embankment in a manner which would not have been proper, had the title come from any other source.

The plaintiff sold a part of his land, knowing it was purchased for a road; but he did not sell the right to use the land granted, in such a way as to do an unnecessary injury to his remaining property.

There may be some difficulty in saying that the response of the judge to the fourth proposition, submitted by the defendants, was entirely correct, but I think with the circuit judge, that it must be regarded as substantially " the doctrine laid down by the Court for the Correction of Errors, in this case."

The answer of the judge to the fifth proposition, like that to the fourth, left it to the jury to speculate upon a doubtful matter, but if that was right in the one case, I do not see that it was not equally right in the other. And, besides, the proposition itself is open to an objection of the same nature as that which is urged against the answer of the judge.

On the whole, although there is ground for doubt whether the defendants are chargeable with the want of ordinary care or skill, I see no clear ground upon which we can disturb the verdict.

New trial denied.

The defendants thereupon sued out a writ of error and brought up the judgment of the Supreme Court, on the second trial, to the Court for the Correction of Errors.

The cause was argued in the Court of Errors in July, 1846, but not decided for want of a quorum voting.

On the first Monday of July, 1847, by operation of law, under the amended constitution (1846), the cause was transferred to and vested in the Court of Appeals. And was argued in the latter court at the September Term, 1847.

*Marcus T. Reynolds*, counsel for plaintiffs in error.

Brown *agt.* The Mohawk and Hudson Rail Road Company.

*First.* The circuit judge improperly admitted the testimony of Benedict, at folio 83; of Kelly at folios 135, 137 and 138; of Tompkins, 213; and of Pierson, folio 218 (*folio* 199; 3 *Kent,* 440, 441; *Angell Water Courses,* 100, 101, 3*d ed; Laws* 1826, *p.* 289, § 11; 4 *Peters,* 80; 5 *Peters,* 198, *general provision*).

*Second.* The judge should have excluded the evidence admitted at folio 93. It was irrelevant and calculated to mislead the jury.

*Third.* The testimony objected to at folios 95 and 96, should have been excluded for the reason assigned by the plaintiff's counsel.

*Fourth.* The circuit judge should have directed a non suit as requested, at folios 153 and 224.

*Fifth.* The judge should have charged the jury as requested by counsel, at folio 225.

*Sixth.* The judge erred in his modification, explanation and qualification of such parts of the charge requested by the defendants, and acceded to by the judge, so as to deprive the defendants of the benefit of all the ruling in their favor, and by leaving the matter to the jury in an unintelligible manner.

*Azor Taber and Joshua A. Spencer,* counsel for defendants in error.

*First.* The decision of the Court of Errors, made in this case on the 28th December, 1842, establishes the proposition that the testimony of the plaintiff below, was sufficient in point of law to authorize the jury to find a verdict against the defendants below, and that the Supreme Court would not have been justified in setting aside the verdict found upon such testimony (see the opinions delivered in Court of Errors).

This disposes of the defendants' second ground of non suit (folios 155 and 224 of the case).

The verdict must therefore stand, unless the judge has committed an error in law, in some of his decisions in relation to the admission or rejection of evidence, or in his refusal to non suit the plaintiff, or in his charge to the jury.

*Second.* The decision of the Court of Errors establishes the proposition of law as applicable to this case: "That if the bridge was not sufficient to protect the plaintiff's buildings

against the previous floods produced only by water setting up Mill creek, and coming through the canal culvert; and if the structure which ordinary care and prudence required to be erected for the protection of the plaintiff's buildings against such floods, would have protected these buildings in the flood of 1832, then the plaintiff was entitled to a verdict."

This proposition was contained in the charge of the judge in relation to the 4th proposition of the defendant's counsel (folio 232).

There was no exception to the refusal of the judge to charge in conformity to this proposition, or to his charge in relation thereto (folios 232 and 233). And no objection can therefore be now taken to such refusal and charge (see opinion of Chancellor, pp. 1, 2; opinion of Bronson, J. folio 254).

*Third.* The jury have found by their verdict, the facts and the only facts held to be necessary by the Court of Errors to entitle the plaintiff below to a verdict, viz: 1st. That the defendants below were guilty of negligence in the construction of their embankment and bridge over Mill creek. 2d. That the destruction of plaintiff's buildings was the necessary result of such negligence. And 3d. That the property of the plaintiff would not have been destroyed by the flood of 1832, if the bridge had been so constructed as to render the plaintiff's buildings safe as against such freshets as might reasonably have been anticipated (opinion of Chan. pp. 1 and 2; opinion of Pres. Bradish, p. 4; opinion of Sen. Franklin, pp. 6, 7).

*Fourth.* The judge's charge in relation to the 5th proposition of the defendants below (folio 228, 233, 234), was a mere corrollary from the principle of law decided by the Court of Errors, and reiterated in the charge of the judge in relation to the 4th proposition (folio 232). The charge was correct, and was in strict conformity to the 5th proposition. The modification of the same by the judge did not conflict with the proposition. And the proposition itself is open to an objection of the same nature as that which is urged against the answer of the judge. (opinion of Bronson, J. folio 255).

As the plaintiff below had buildings standing on the walls of the creek, and over the creek, for several years previous to, and

at the time of the construction of the defendants' road (folios 79, 108, 109, 119, 120, 114, 134, 135, 122, 200; maps, schedules A and B), he had a legal right after the construction of the road, to use his buildings in the same or in a like situation in which he had been accustomed to use them before the road was made; and the defendants below were bound so to construct their embankment and bridge, as to protect these buildings in the same situation they were in before the road was made, and also other buildings which should afterwards be placed by the plaintiff in a like situation.

The plaintiff below had a perfect right to enjoy his property in the same manner after the road was made, as he had been accustomed to enjoy it before the making of the road. Of the manner of this enjoyment by the plaintiff, the defendants had notice at the time of the construction of their road, as the building next below the bridge at the time the construction of the road was commenced, stood in the track of the road and on the walls of the creek (folios 117, 119, 120, 134, 135. *Lasala* v. *Holbrook*, 4 *Paige*, 169).

In this view of the case, the defendants below were guilty of negligence in increasing the water way above the walls of the creek, and in erecting a solid embankment from the creek to the canal, thereby directing the whole volume of the water against the plaintiff's buildings. And if by this concentration of the water the plaintiff's buildings were carried off, although they were so carried off without any agency of the bridge in producing that result, the defendants below would be liable for the injury sustained (*The Lehigh Br. Co.* v. *The Lehigh C. & N. Co.*, 4 *Rawle*, 25).

*Fifth.* The judge charged the jury as requested by the defendants below, that the law was as stated in the defendants' 1st and 2d propositions (folios 226, 228, 229).

*Sixth.* The judge charged in relation to the defendants' 3d proposition, which proposition was, that the deed from the plaintiff below to the defendants below, authorized the latter to build their embankment without any opening therein, was correct. And this is the only part of the charge left open for discussion by the decision of the Court of Errors.

The Legislature had no power to grant to the defendants an

If common prudence required a culvert in the embankment between the creek and the canal, to protect the plaintiff's buildings from the effects of such floods as might then have been anticipated, the omission to make such culvert, rendered the defendants liable for the injury which had occurred, and the deed from the plaintiff to them could not excuse them from such liability.

The deed conveyed no greater rights to the defendants than they would have acquired by an appraisement under their charter.

The deed was a mere substitute for the appraisement.

· But the defendants can claim no benefit from the deed.  It was not executed till after the flood, and the occurrence of the injury to the plaintiff's buildings (folios 160, 167).  And proposition 3d, and the exception to the charge in relation thereto, is inapplicable to the case.

When the embankment and bridge were constructed, the defendants had no title to the track of their road.  And they of course had no right to erect an obstruction to the passage of the water to the river.  The terms of the contract for the land were not proved, nor was it proved whether such contract was in writing or by parol.

The land acquired by the defendants could only be used in such a manner as would not injure the property of adjacent owners.  The maxim *"Sic utere tuo ut alienum non lædas,"* applies.

The defendants by their charter were required to make a culvert in their embankment in the range of the ravine.  They were required to restore all streams of water and water courses crossed by their road to their former state of usefulness.  The ravine was a water course (*Laws of* 1826, p. 289, Sec. 11).

The owners of the adjacent lands were entitled to the protection of all the safe-guards from the floods, which they enjoyed previous to the construction of the defendants' road.  And the defendants could not diminish or destroy these safe-guards, without being liable for all injuries resulting from their diminution or destruction.

exemption from liability for consequential injuries produced by

Brown *agt.* The Mohawk and Hudson Rail Road Company.

the construction of their road and bridge. Such a grant, as no provision for full compensation is made, could not be sustained. It would be a violation of the Constitution (*Bloodgood* v. *the M. & H. R. R. Co.,* 18 *Wend.* 1; *Fletcher* v. *the A. & S. R. R. Co.,* 25 *Wend.* 462; 3 *Paige* 73; 5 *ibid.* 137).

Neither the defendants' charter, nor their contract or deed, gives them any exemption from liability for the consequences of a negligent and unskillful construction of their road.

Upon the maxim or principle, "*Sic utere tuo, ut alienum, non lædas,*" most of the actions on the case for consequential injuries are founded (*Panton* v. *Holland,* 17 *John.* 92; *Lasala* v. *Holbrook,* 4 *Paige,* 169; *Thurston* v. *Hancock,* 12 *Mass.* 220: *Brown* v. *Windsor,* 1 *Crompton and Jervis R.* 26; *per Garrow B:* 1 *Rolle* 430; *Roberts* v. *Read,* 16 *East,* 215; *Smith* v. *Martin,* 2 *Saunders,* 394; 3 *Hill,* 193; 1 *com. Dig. action on case for nuisance E* (*A*); *Moore* v. *Brown,* 3 *Dy.* 319, *b*; 1 *Bac. Ab. action on case F*; 1 *Salk.* 21; 2 *Ray,* 1089; *S. C.* 2 *Ray,* 1091).

The case of *Fletcher* v. *The A. & S. R. R. Co.,* 25 *Wend.* 462, fully establishes the principle of the liability of rail road companies, for all consequential injuries to owners of adjacent lands.

*Seventh.* The defendants' motion for a non suit was properly overruled (*folio* 153 *to* 158).

1st. The first ground of non suit, that the evidence varied from the declaration, was incorrect in point of fact. The declaration was broad enough to cover the injury proved to have been sustained by the plaintiff (*folio* 251). But if not, the declaration can be amended on the argument, so as to conform to the proof.

This amendment can be made either by virtue of the provisions of the Rev. Stat. (2 *R. S.* 424, § 4, 7, 8) or by virtue of the general power of the court, to allow amendments in cases not provided for by the statute (9 *Wend.* 307; 15 *Wend.* 410; 17 *Wend.* 75; 19 *Wend.* 541, 542; 24 *Wend.* 480; 1 *Hill,* 121; 4 *Hill,* 190; 15 *Wend.* 672, 673).

2d. The second ground of non suit was covered by the decision of the Court of Errors.

3d. In the third ground of non suit, the defendants assume as a fact, what is not warranted by the evidence, and the question in relation to which belonged to the jury to decide. And this question the court could not withdraw from the jury (*folio* 252: *Bell* v. *McClintock*, 9 *Watts R.* 119; *Lehigh B. Co.* v. *Lehigh C. & N. Co.* 4 *Rawle* 25; 6 *John.* 90; *Jones on Bail*, 120; ·7 *Con.* 500. After the decision of the Court of Errors settling the law of this case, it would have been improper for the judge to have non suited the plaintiff. There was proof enough under that decision to carry the cause to the jury (*folio* 252).

*Eighth.* The judgments and opinions of the Plaintiff's witnesses, viz: Benedict, Elder, Kelly, Tompkins, and Pierson, were properly received in evidence.

In cases of questions of science or trade, or others of the · same kind, where, from the nature of the subject, facts disconnected from opinions can not be so presented to a jury as to enable them to pass upon the question, with the requisite knowledge and judgment, not only the opinions of men of science, or experts, are received in evidence, but also the opinions of all trained observers, who from their observation and experience have acquired a peculiar knowledge of the subject, are given in evidence in connection with facts within their own knowledge, on which they are founded (·1 *Phil. Ev.* 290; *Folks* v. *Chadd.* 3 *Dong.* 157; *Case of Wells Harbor; Peake N. P. C.* 25, 43; 2 *Stark N. P. C.* 258; 4 *Espi. N. P. C.* 145; 12 *Moore*, 148; 1 *Car & Payne*, 70; 9 *Car & Payne*, 601; 10 *Bar* & *Cres*, 527; 1 *Camp N. P. C.* 117; 4 *Term. R.* 498; 10 *Bingh.* 56; 7 *Wend.* 72; 1 *Paige*,173; 4 *Cow.* 355; *Trelawny* v. *Coleman*, 2 *Star* 191; 23 *Wend.* 433, 356; 4 *Conn. R.* 208, 209; *Grant* v. *Thompson*, 3 *Mass.* 330; 9 *Mass.* 225; 11 *Ser. & Rawle*, 141; 7 *Ser. & R.* 90; 23 *Wend.* 432).

But if the opinions of any of the plaintiff's witnesses were not legal evidence, this objection can not now be taken; and the ruling of the judge in receiving such opinions as evidence can be supported, because the objection taken on the trial, went to the nature of the evidence, and not to the qualification of the witnesses.

When the opinions of the witnesses were called for, the

defendants objected that the evidence was illegal and improper; not that the witnesses were not men of science or skill, that they were not experts, and therefore, for this cause, could not give their opinions.

The objection was, that all opinions were inadmissible as evidence; not that these particular witnesses were not qualified (not being experts) to give opinions.

This turned the attention of the judge to the question, whether this was a case for receiving opinions; and not to the inquiry whether these witnesses were qualified to give opinions.

The specific objection that they were not experts, or men of skill was not taken. Not being taken at the proper time, it can not prevail here (*folio* 250; 1 *Cow.* 622). The party excepting must lay his finger on the point which arises in admitting or denying evidence (23 *Wend.* 316; 12 *Wend.* 504; 9 *Wend.* 109; 1 *Wend.* 418; 1 *Hill,* 91).

*Ninth.* The evidence of what the plaintiff said to the engineer of the defendants (who had charge of the building of the bridge) at the time of its construction, about its sufficiency, was properly received. The engineer was the agent of the defendants.

This was not proof of any thing that passed between the plaintiff and a stranger to the defendants (*folio* 251). This same testimony was given by Crane (witness of defendants), without objection (*folio* 199; *Angell & A. Corp.* 299; 3 *How.* 515, 530, *as to mode of excepting;* 17 *Wend* 257; 9 *Stewart & Porter, Al.,* 330).

On the 29th November, 1847, the judgment of the Supreme Court was *reversed,* and a *venire de novo awarded.*

GARDINER, Judge, delivered the opinion of the court, as follows:

GARDINER, J.—This was an action on the case brought by Brown against the plaintiffs in error for negligence in the construction of a bridge and embankment; in consequence of which his buildings were carried away by a freshet. Upon the trial, Ephraim Benedict was called as a witness for Brown, and asked

the following question by the counsel of the defendant in error: " How could the rail road embankment have been constructed so that in your judgment it would have protected the plaintiff's buildings?"

The question was objected to by the counsel for the plaintiffs in error, upon the ground that the *inquiry* was as to the *opinion* or *judgment* of the witness, which was not legal evidence. The circuit judge decided that the *inquiry* was legal and proper, and overruled the objection thereto, and directed the question to be answered.

To which decision and opinion the counsel for the rail road company excepted.

Was the exception well taken, is the question to be determined. " A witness," says the chief justice, " must speak to facts; his opinions are not evidence; such is the general rule." This is undoubtedly true. The presumption of law was opposed therefore to the admissibility of the evidence. As the facts appeared, at the time of the inquiry there was nothing to countervail that presumption. And the court must have intended to decide that the opinion of the witness, whether an expert or not, was competent.

The chief justice remarks that the only ground upon which the ruling of the judge can be supported is, that the objection taken on the trial went to the nature of the evidence, and not to the qualifications of the witness.

I do not so understand the objection. The objection was that the opinion of *the witness* then under examination was not legal evidence. The chief justice changes the form of that objection, and supposes the counsel to insist that evidence of opinion from *any* witness was illegal. This would be, undoubtedly, an objection to the nature of the evidence. And is a very different proposition indeed from insisting that the opinion of the particular witness is inadmissible. The first would be the unqualified assertion of a proposition not universally true, and therefore false in point of law. The latter (which is the objection taken at the trial) points with sufficient distinctness to the incompetency of the witness. As there is no evidence that the witness was an expert, but the contrary, I am of the opinion that the

Brown *agt.* The Mohawk and Hudson Rail Road Company.

exception was well taken, and that the judgment of the Supreme Court should be reversed.

Objections of the same character were taken to the testimony of other witnesses similarly situated.

The case of Benedict has been selected not because it differs in principle from the others, but because the manner in which the objection was made was the least obnoxious to criticism.

*For Reversal.*—JEWETT, Ch. J., GARDINER, JONES, GRAY, and JOHNSON, Judges, on the sole ground that the witnesses were not *experts*, and should not therefore have been allowed to give their *opinions*.

*For Affirmance.*—BRONSON, RUGGLES and WRIGHT, Judges, dissented, on the ground, that the point that the witnesses were not experts, was not made by the bill of exceptions.

NOTE.—THE COURT OF ERRORS, in this case, appear to have established the following principles:

That *testimony* is insufficient in point of law to sustain a suit, where it would be the duty of the court to set aside the verdict and grant a new trial, if the jury found a verdict in favor of the plaintiff.

But where the testimony is sufficient to sustain a verdict in favor of a plaintiff, if the jury should find one in his favor, the questions of fact should be submitted to the jury. Although the circuit judge may think the evidence leaves the case in so much doubt, that the jury would be justified in finding a verdict for defendant.

The grantees in an important public franchise, should so exercise their privileges and rights as not to injure or impair the rights of others.

It is their duty to exercise such forecast and precaution, in the construction and use of their works, as that the property of others, using ordinary prudence, should remain safe from any danger or injury therefrom.

And where it is alleged that proper precaution, care and prudence have not been exercised and used in and about the construction and use of such public works, it is a proper case to be determined by the testimony of those who are familiar with all the circumstances connected with the location and construction, which are clearly matters of fact, upon which parties litigant have a right to the judgment of a jury.

*Held,* that the testimony in this case, taken altogether (on the first trial), was of such a character and degree, as fairly to entitle the plaintiff to the verdict of a jury upon it, and that it should have been submitted to the jury for that purpose.

THE COURT OF APPEALS—*Held,* that the *judgments* and *opinions* of the plaintiff's witnesses should have been excluded under the objections made, that the testimony was *illegal and improper.* That the objections went to the *qualifications of the witnesses,* and not to the *nature of the evidence.*

It was not necessary to make the distinct objection, that the witnesses *were not experts.*